# SHAPERO v. KENTUCKY BAR ASSOCIATION

No. 87–16. Argued March 1, 1988—Decided June 13, 1988

BRENNAN, J., announced the judgment of the Court and delivered the opinion of the Court with respects to Parts I and II, in which WHITE, MARSHALL, BLÁCKMUN, STEVENS, and KENNEDY, JJ., joined, and an opinion with respect to Part III, in which MARSHALL, BLACKMUN, and KENNEDY, JJ., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 480. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 480.

*Donald L. Cox* argued the cause for petitioner. With him on the briefs was *Mary Janice Lintner.*

*Frank P. Doheny, Jr.,* argued the cause for respondent. With him on the brief was *Joseph L. Lenihan.**

JUSTICE BRENNAN announced the judgment of the Court and delivered the opinion of the Court as to Parts I and II and an opinion as to Part III in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE KENNEDY join.

This case presents the issue whether a State may, consistent with the First and Fourteenth Amendments, categorically prohibit lawyers from soliciting legal business for pecuniary gain by sending truthful and nondeceptive letters to potential clients known to face particular legal problems.

---

*Briefs of *amici curiae* urging affirmance were filed for the Academy of Florida Trial Lawyers by *C. Rufus Pennington III;* for the American Bar Association by *Robert MacCrate, Michael Franck,* and *George Kuhlman;* for the Association of Trial Lawyers of America by *Jeffrey Robert White;* and for the Florida Bar by *Barry Richard* and *Ray Ferrero, Jr.*

## I

In 1985, petitioner, a member of Kentucky's integrated Bar Association, see Ky. Sup. Ct. Rule 3.030 (1988), applied to the Kentucky Attorneys Advertising Commission[1] for approval of a letter that he proposed to send "to potential clients who have had a foreclosure suit filed against them." The proposed letter read as follows:

> "It has come to my attention that your home is being foreclosed on. If this is true, you may be about to lose your home. Federal law may allow you to keep your home by *ORDERING* your creditor *[sic]* to *STOP* and give you more time to pay them.
>
> "You may call my office anytime from 8:30 a. m. to 5:00 p. m. for *FREE* information on how you can keep your home.
>
> "Call *NOW*, don't wait. It may surprise you what I may be able to do for you. Just call and tell me that you got this letter. Remember it is *FREE*, there is *NO* charge for calling."

The Commission did not find the letter false or misleading. Nevertheless, it declined to approve petitioner's proposal on the ground that a then-existing Kentucky Supreme Court Rule prohibited the mailing or delivery of written advertisements "precipitated by a specific event or occurrence involving or relating to the addressee or addressees as distinct

---

[1] The Attorneys Advertising Commission is charged with the responsibility of "regulating attorney advertising as prescribed" in the Rules of the Kentucky Supreme Court. Ky. Sup. Ct. Rule 3.135(3) (1988). The Commission's decisions are appealable to the Board of Governors of the Kentucky Bar Association, Rule 3.135(8)(a), and are ultimately reviewable by the Kentucky Supreme Court. Rule 3.135(8)(b). "Any attorney who is in doubt as to the propriety of any professional act contemplated by him" also has the option of seeking an advisory opinion from a committee of the Kentucky Bar Association, which, if formally adopted by the Board of Governors, is reviewable by the Kentucky Supreme Court. Rule 3.530.

from the general public." Ky. Sup. Ct. Rule 3.135(5)(b)(i).[2] The Commission registered its view that Rule 3.135(5)(b)(i)'s ban on targeted, direct-mail advertising violated the First Amendment—specifically the principles enunciated in *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985)—and recommended that the Kentucky Supreme Court amend its Rules. See App. to Pet. for Cert. 11a–15a. Pursuing the Commission's suggestion, petitioner petitioned the Committee on Legal Ethics (Ethics Committee) of the Kentucky Bar Association for an advisory opinion as to the Rule's validity. See Ky. Sup. Ct. Rule 3.530; n. 1, *supra*. Like the Commission, the Ethics Committee, in an opinion formally adopted by the Board of Governors of the Bar Association, did not find the proposed letter false or misleading, but nonetheless upheld Rule 3.135(5)(b)(i) on the ground that it was consistent with Rule 7.3 of the American Bar Association's Model Rules of Professional Conduct (1984). App. to Pet. for Cert. 9a.

On review of the Ethics Committee's advisory opinion, the Kentucky Supreme Court felt "compelled by the decision in *Zauderer* to order [Rule 3.135(5)(b)(i)] deleted," 726 S. W. 2d 299, 300 (1987), and replaced it with the ABA's Rule 7.3, which provides in its entirety:

> "'A lawyer may not solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship, by mail, in-person or otherwise, when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain. The term 'solicit' includes contact in person, by telephone or

---

[2] Rule 3.135(5)(b)(i) provided in full:

"A written advertisement may be sent or delivered to an individual addressee only if that addressee is one of a class of persons, other than a family, to whom it is also sent or delivered at or about the same time, and only if it is not prompted or precipitated by a specific event or occurrence involving or relating to the addressee or addressees as distinct from the general public."

telegraph, by letter or other writing, or by other communication directed to a specific recipient, but does not include letters addressed or advertising circulars distributed generally to persons not known to need legal services of the kind provided by the lawyer in a particular matter, but who are so situated that they might in general find such services useful.'" 726 S. W. 2d, at 301 (quoting ABA, Model Rule of Professional Conduct 7.3 (1984)).

The court did not specify either the precise infirmity in Rule 3.135(5)(b)(i) or how Rule 7.3 cured it. Rule 7.3, like its predecessor, prohibits targeted, direct-mail solicitation by lawyers for pecuniary gain, without a particularized finding that the solicitation is false or misleading. We granted certiorari to resolve whether such a blanket prohibition is consistent with the First Amendment, made applicable to the States through the Fourteenth Amendment, 484 U. S. 814 (1987), and now reverse.[3]

---

[3] We reject respondent's request that we dismiss or affirm this case because "the Supreme Court of Kentucky granted Shapero precisely the relief which he requested." Brief for Respondent 11. The court below did, as petitioner prayed, "declare . . . rule [3.135(5)(b)(i)] void," Motion for Review of Advisory Opinion E–310, No. 86–SC–335 (Sup. Ct. Ky.). The court's ultimate disposition, however, was to adopt a new Rule with the same defect that petitioner identified in the old one and to "affirm the decision of the Ethics Committee to deny [petitioner's] request" for approval of his letter. 726 S. W. 2d 299, 301 (1987). Petitioner surely cannot be said to have prevailed below.

Nor does the fact that petitioner never leveled his constitutional challenge specifically against Rule 7.3 mean that this case presents "federal constitutional issues [that were] raised here for the first time on review of [a] state court decisio[n]," *Cardinale* v. *Louisiana*, 394 U. S. 437, 438 (1969). The parties briefed and argued the constitutionality of a categorical ban on targeted, direct-mail advertising, and the court below plainly considered and rejected those arguments as it adopted Model Rule 7.3. See 726 S. W. 2d, at 300.

We also decline respondent's invitation to dismiss this case in order to avoid interference with ongoing state judicial proceedings. See *Younger*

## II

Lawyer advertising is in the category of constitutionally protected commercial speech. See *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977). The First Amendment principles governing state regulation of lawyer solicitations for pecuniary gain are by now familiar: "Commercial speech that is not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." *Zauderer, supra,* at 638 (citing *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York,* 447 U. S. 557, 566 (1980)). Since state regulation of commercial speech "may extend only as far as the interest it serves," *Central Hudson, supra,* at 565, state rules that are designed to prevent the "potential for deception and confusion . . . may be no broader than reasonably necessary to prevent the" perceived evil. *In re R. M. J.,* 455 U. S. 191, 203 (1982).

In *Zauderer,* application of these principles required that we strike an Ohio rule that categorically prohibited solicitation of legal employment for pecuniary gain through advertisements containing information or advice, even if truthful and nondeceptive, regarding a specific legal problem. We distinguished written advertisements containing such information or advice from in-person solicitation by lawyers for profit, which we held in *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447 (1978), a State may categorically ban. The "unique features of in-person solicitation by lawyers [that] justified a prophylactic rule prohibiting lawyers from engaging in such solicitation for pecuniary gain," we observed, are "not present" in the context of written advertisements. *Zauderer, supra,* at 641–642.

---

v. *Harris,* 401 U. S. 37 (1971). Once the court below rendered its final judgment in this case, there was no longer any pending state judicial proceeding.

Our lawyer advertising cases have never distinguished among various modes of written advertising to the general public. See, e. g., *Bates*, *supra* (newspaper advertising); *id.*, at 372, n. 26 (equating advertising in telephone directory with newspaper advertising); *In re R. M. J.*, *supra* (mailed announcement cards treated same as newspaper and telephone directory advertisements). Thus, Ohio could no more prevent Zauderer from mass-mailing to a general population his offer to represent women injured by the Dalkon Shield than it could prohibit his publication of the advertisement in local newspapers. Similarly, if petitioner's letter is neither false nor deceptive, Kentucky could not constitutionally prohibit him from sending at large an identical letter opening with the query, "Is your home being foreclosed on?," rather than his observation to the targeted individuals that "It has come to my attention that your home is being foreclosed on." The drafters of Rule 7.3 apparently appreciated as much, for the Rule exempts from the ban "letters addressed or advertising circulars distributed generally to persons . . . who are so situated that they might in general find such services useful."

The court below disapproved petitioner's proposed letter solely because it targeted only persons who were "known to need [the] legal services" offered in his letter, 726 S. W. 2d, at 301, rather than the broader group of persons "so situated that they might in general find such services useful." Generally, unless the advertiser is inept, the latter group would include members of the former. The only reason to disseminate an advertisement of particular legal services among those persons who are "so situated that they might in general find such services useful" is to reach individuals who *actually* "need legal services of the kind provided [and advertised] by the lawyer." But the First Amendment does not permit a ban on certain speech merely because it is more efficient; the State may not constitutionally ban a particular letter on the

theory that to mail it only to those whom it would most interest is somehow inherently objectionable.

The court below did not rely on any such theory. See also Brief for Respondent 37 (conceding that "targeted direct mail *advertising*"—as distinguished from *"solicitation"*—"is constitutionally protected") (emphasis in original). Rather, it concluded that the State's blanket ban on all targeted, direct-mail solicitation was permissible because of the "serious potential for abuse inherent in direct solicitation by lawyers of potential clients known to need specific legal services." 726 S. W. 2d, at 301. By analogy to *Ohralik*, the court observed:

> "Such solicitation subjects the prospective client to pressure from a trained lawyer in a direct personal way. It is entirely possible that the potential client may feel overwhelmed by the basic situation which caused the need for the specific legal services and may have seriously impaired capacity for good judgment, sound reason and a natural protective self-interest. Such a condition is full of the possibility of undue influence, overreaching and intimidation." 726 S. W. 2d, at 301.

Of course, a particular potential client will feel equally "overwhelmed" by his legal troubles and will have the same "impaired capacity for good judgment" regardless of whether a lawyer mails him an untargeted letter or exposes him to a newspaper advertisement—concededly constitutionally protected activities—or instead mails a targeted letter. The relevant inquiry is not whether there exist potential clients whose "condition" makes them susceptible to undue influence, but whether the mode of communication poses a serious danger that lawyers will exploit any such susceptibility. Cf. *Ohralik, supra,* at 470 (MARSHALL, J., concurring in part and concurring in judgment) ("What is objectionable about Ohralik's behavior here is not so much that he solicited business for himself, but rather the circumstances in which he

performed that solicitation and the means by which he accomplished it").

Thus, respondent's facile suggestion that this case is merely *"Ohralik* in writing" misses the mark. Brief for Respondent 10. In assessing the potential for overreaching and undue influence, the mode of communication makes all the difference. Our decision in *Ohralik* that a State could categorically ban all in-person solicitation turned on two factors. First was our characterization of face-to-face solicitation as "a practice rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and outright fraud." *Zauderer*, 471 U. S., at 641. See *Ohralik*, 436 U. S., at 457–458, 464–465. Second, "unique . . . difficulties," *Zauderer, supra*, at 641, would frustrate any attempt at state regulation of in-person solicitation short of an absolute ban because such solicitation is "not visible or otherwise open to public scrutiny." *Ohralik*, 436 U. S., at 466. See also *ibid.* ("[I]n-person solicitation would be virtually immune to effective oversight and regulation by the State or by the legal profession") (footnote omitted). Targeted, direct-mail solicitation is distinguishable from the in-person solicitation in each respect.

Like print advertising, petitioner's letter—and targeted, direct-mail solicitation generally—"poses much less risk of overreaching or undue influence" than does in-person solicitation, *Zauderer*, 471 U. S., at 642. Neither mode of written communication involves "the coercive force of the personal presence of a trained advocate" or the "pressure on the potential client for an immediate yes-or-no answer to the offer of representation." *Ibid.* Unlike the potential client with a badgering advocate breathing down his neck, the recipient of a letter and the "reader of an advertisement . . . can 'effectively avoid further bombardment of [his] sensibilities simply by averting [his] eyes,'" *Ohralik, supra*, at 465, n. 25 (quoting *Cohen* v. *California*, 403 U. S. 15, 21 (1971)). A letter, like a printed advertisement (but unlike a lawyer), can

readily be put in a drawer to be considered later, ignored, or discarded. In short, both types of written solicitation "conve[y] information about legal services [by means] that [are] more conducive to reflection and the exercise of choice on the part of the consumer than is personal solicitation by an attorney." *Zauderer, supra,* at 642. Nor does a targeted letter invade the recipient's privacy any more than does a substantively identical letter mailed at large. The invasion, if any, occurs when the lawyer discovers the recipient's legal affairs, not when he confronts the recipient with the discovery.

Admittedly, a letter that is personalized (not merely targeted) to the recipient presents an increased risk of deception, intentional or inadvertent. It could, in certain circumstances, lead the recipient to overestimate the lawyer's familiarity with the case or could implicitly suggest that the recipient's legal problem is more dire than it really is. See Brief for ABA as *Amicus Curiae* 9. Similarly, an inaccurately targeted letter could lead the recipient to believe she has a legal problem that she does not actually have or, worse yet, could offer erroneous legal advice. See, *e. g., Leoni* v. *State Bar of California,* 39 Cal. 3d 609, 619–620, 704 P. 2d 183, 189 (1985), summarily dism'd, 475 U. S. 1001 (1986).

But merely because targeted, direct-mail solicitation presents lawyers with opportunities for isolated abuses or mistakes does not justify a total ban on that mode of protected commercial speech. See *In re R. M. J.,* 455 U. S., at 203. The State can regulate such abuses and minimize mistakes through far less restrictive and more precise means, the most obvious of which is to require the lawyer to file any solicitation letter with a state agency, *id.,* at 206, giving the State ample opportunity to supervise mailings and penalize actual abuses. The "regulatory difficulties" that are "unique" to in-person lawyer solicitation, *Zauderer, supra,* at 641—solicitation that is "not visible or otherwise open to public scrutiny" and for which it is "difficult or impossible to obtain reliable proof of what actually took place," *Ohralik, supra,* at 466—do not apply to written solicitations. The court below of-

fered no basis for its "belie[f] [that] submission of a blank form letter to the Advertising Commission [does not] provid[e] a suitable protection to the public from overreaching, intimidation or misleading private targeted mail solicitation." 726 S. W. 2d, at 301. Its concerns were presumably those expressed by the ABA House of Delegates in its comment to Rule 7.3:

> "State lawyer discipline agencies struggle for resources to investigate specific complaints, much less for those necessary to screen lawyers' mail solicitation material. Even if they could examine such materials, agency staff members are unlikely to know anything about the lawyer or about the prospective client's underlying problem. Without such knowledge they cannot determine whether the lawyer's representations are misleading." ABA, Model Rules of Professional Conduct, pp. 93–94 (1984).

The record before us furnishes no evidence that scrutiny of targeted solicitation letters will be appreciably more burdensome or less reliable than scrutiny of advertisements. See *Bates*, 433 U. S., at 379; *id.*, at 387 (Burger, C. J., concurring in part and dissenting in part) (objecting to "enormous new regulatory burdens called for by" *Bates*). As a general matter, evaluating a targeted advertisement does not require specific information about the recipient's identity and legal problems any more than evaluating a newspaper advertisement requires like information about all readers. If the targeted letter specifies facts that relate to particular recipients (*e. g.*, "It has come to my attention that your home is being foreclosed on"), the reviewing agency has innumerable options to minimize mistakes. It might, for example, require the lawyer to prove the truth of the fact stated (by supplying copies of the court documents or material that led the lawyer to the fact); it could require the lawyer to explain briefly how he or she discovered the fact and verified its accuracy; or it could require the letter to bear a label identifying it as an advertisement, see *id.*, at 384 (dictum); *In re R. M. J., supra,*

at 206, n. 20, or directing the recipient how to report inaccurate or misleading letters. To be sure, a state agency or bar association that reviews solicitation letters might have more work than one that does not. But "[o]ur recent decisions involving commercial speech have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." *Zauderer*, 471 U. S., at 646.

## III

The validity of Rule 7.3 does not turn on whether petitioner's letter itself exhibited any of the evils at which Rule 7.3 was directed. See *Ohralik*, 436 U. S., at 463–464, 466. Since, however, the First Amendment overbreadth doctrine does not apply to professional advertising, see *Bates*, 433 U. S., at 379–381, we address respondent's contentions that petitioner's letter is particularly overreaching, and therefore unworthy of First Amendment protection. *Id.*, at 381. In that regard, respondent identifies two features of the letter before us that, in its view, coalesce to convert the proposed letter into "high pressure solicitation, overbearing solicitation," Brief for Respondent 20, which is not protected. First, respondent asserts that the letter's liberal use of underscored, uppercase letters (*e. g.*, "Call *NOW*, don't wait"; "it is *FREE*, there is *NO* charge for calling") "fairly shouts at the recipient . . . that he should employ Shapero." *Id.*, at 19. See also Brief in Opposition 11 ("Letters of solicitation which shout commands to the individual, targeted recipient in words in underscored capitals are of a different order from advertising and are subject to proscription"). Second, respondent objects that the letter contains assertions (*e. g.*, "It may surprise you what I may be able to do for you") that "stat[e] no affirmative or objective fact," but constitute "pure salesman puffery, enticement for the unsophisticated, which commits Shapero to nothing." Brief for Respondent 20.

The pitch or style of a letter's type and its inclusion of subjective predictions of client satisfaction might catch the recipient's attention more than would a bland statement of purely objective facts in small type. But a truthful and nondeceptive letter, no matter how big its type and how much it speculates can never "shou[t] at the recipient" or "gras[p] him by the lapels," *id.*, at 19, as can a lawyer engaging in face-to-face solicitation. The letter simply presents no comparable risk of overreaching. And so long as the First Amendment protects the right to solicit legal business, the State may claim no substantial interest in restricting truthful and nondeceptive lawyer solicitations to those least likely to be read by the recipient. Moreover, the First Amendment limits the State's authority to dictate what information an attorney may convey in soliciting legal business. "[T]he States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information may also be presented in a way that is not deceptive," unless the State "assert[s] a substantial interest" that such a restriction would directly advance. *In re R. M. J.*, 455 U. S., at 203. Nor may a State impose a more particularized restriction without a similar showing. Aside from the interests that we have already rejected, respondent offers none.

To be sure, a letter may be misleading if it unduly emphasizes trivial or "relatively uninformative fact[s]," *In re R. M. J.*, *supra*, at 205 (lawyer's statement, "in large capital letters, that he was a member of the Bar of the Supreme Court of the United States"), or offers overblown assurances of client satisfaction, cf. *In re Von Wiegen*, 63 N. Y. 2d 163, 179, 470 N. E. 2d 838, 847 (1984) (solicitation letter to victims of massive disaster informs them that "it is [the lawyer's] opinion that the liability of the defendants is clear"), cert. denied, 472 U. S. 1007 (1985); *Bates*, *supra*, at 383–384 ("[A]dvertising claims as to the quality of legal services . . . may be so likely to be misleading as to warrant restriction"). Respondent does not argue before us that petitioner's letter was

misleading in those respects. Nor does respondent contend that the letter is false or misleading in any other respect. Of course, respondent is free to raise, and the Kentucky courts are free to consider, any such argument on remand.

The judgment of the Supreme Court of Kentucky is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

I agree with Parts I and II of the Court's opinion, but am of the view that the matters addressed in Part III should be left to the state courts in the first instance.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

Relying primarily on *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985), the Court holds that States may not prohibit a form of attorney advertising that is potentially more pernicious than the advertising at issue in that case. I agree with the Court that the reasoning in *Zauderer* supports the conclusion reached today. That decision, however, was itself the culmination of a line of cases built on defective premises and flawed reasoning. As today's decision illustrates, the Court has been unable or unwilling to restrain the logic of the underlying analysis within reasonable bounds. The resulting interference with important and valid public policies is so destructive that I believe the analytical framework itself should now be reexamined.

I

*Zauderer* held that the First Amendment was violated by a state rule that forbade attorneys to solicit or accept employment through advertisements containing information or advice regarding a specific legal problem. See *id.*, at 639–647.

I dissented from this holding because I believed that our precedents permitted, and good judgment required, that we give greater deference to the States' legitimate efforts to regulate advertising by their attorneys. Emphasizing the important differences between professional services and standardized consumer products, I concluded that unsolicited legal advice was not analogous to the free samples that are often used to promote sales in other contexts. First, the quality of legal services is typically more difficult for most laypersons to evaluate, and the consequences of a mistaken evaluation of the "free sample" may be much more serious. For that reason, the practice of offering unsolicited legal advice as a means of enticing potential clients into a professional relationship is much more likely to be misleading than superficially similar practices in the sale of ordinary consumer goods. Second, and more important, an attorney has an obligation to provide clients with complete and disinterested advice. The advice contained in unsolicited "free samples" is likely to be colored by the lawyer's own interest in drumming up business, a result that is sure to undermine the professional standards that States have a substantial interest in maintaining.

*Zauderer* dealt specifically with a newspaper advertisement. Today's decision—which invalidates a similar rule against targeted, direct-mail advertising—wraps the protective mantle of the Constitution around practices that have even more potential for abuse. First, a personalized letter is somewhat more likely "to overpower the will and judgment of laypeople who have not sought [the lawyer's] advice." *Zauderer, supra,* at 678 (O'CONNOR, J., concurring in part, concurring in judgment in part, and dissenting in part). For people whose formal contacts with the legal system are infrequent, the authority of the law itself may tend to cling to attorneys just as it does to police officers. Unsophisticated citizens, understandably intimidated by the courts and their officers, may therefore find it much more difficult to ignore

an apparently "personalized" letter from an attorney than to ignore a general advertisement.

Second, "personalized" form letters are designed to suggest that the sender has some significant personal knowledge about, and concern for, the recipient. Such letters are reasonably transparent when they come from somebody selling consumer goods or stock market tips, but they may be much more misleading when the sender belongs to a profession whose members are ethically obliged to put their clients' interests ahead of their own.

Third, targeted mailings are more likely than general advertisements to contain advice that is unduly tailored to serve the pecuniary interests of the lawyer. Even if such mailings are reviewed in advance by a regulator, they will rarely be seen by the bar in general. Thus, the lawyer's professional colleagues will not have the chance to observe how the desire to sell oneself to potential customers has been balanced against the duty to provide objective legal advice. An attorney's concern with maintaining a good reputation in the professional community, which may in part be motivated by long-term pecuniary interests, will therefore provide less discipline in this context than in the case of general advertising.

Although I think that the regulation at issue today is even more easily defended than the one at issue in *Zauderer*, I agree that the rationale for that decision may fairly be extended to cover today's case. Targeted direct-mail advertisements—like general advertisements but unlike the kind of in-person solicitation that may be banned under *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978)—can at least theoretically be regulated by the States through prescreening mechanisms. In-person solicitation, moreover, is inherently more prone to abuse than almost any form of written communication. *Zauderer* concluded that the decision in *Ohralik* was limited by these "unique features" of in-person solicitation, see 471 U. S., at 641, and today's majority simply ap-

plies the logic of that interpretation of *Ohralik* to the case before us.

## II

Attorney advertising generally falls under the rubric of "commercial speech." Political speech, we have often noted, is at the core of the First Amendment. See, *e. g.*, *Boos* v. *Barry*, 485 U. S. 312, 318 (1988). One reason for the special status of political speech was suggested in a metaphor that has become almost as familiar as the principle that it sought to justify: "[W]hen men have realized that time has upset many fighting faiths, they may come to believe . . . that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution." *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting). Cf., *e. g.*, *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 50–51 (1988). Traditionally, the constitutional fence around this metaphorical marketplace of ideas had not shielded the actual marketplace of purely commercial transactions from governmental regulation.

In *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), however, the Court concluded that the First Amendment protects the communication of the following so-called "idea": "I will sell you the X prescription drug at the Y price." See *id.*, at 761. The Court argued that the public interest requires that private economic decisions be well informed, and it suggested that no satisfactory line could be drawn between ideas about public affairs and information relevant to such private decisions. *Id.*, at 762–765. The dissent observed that the majority had overstated the difficulties of distinguishing public affairs from such matters as the "decision . . . to purchase one or another kind of shampoo." *Id.*, at 787 (REHNQUIST, J., dis-

senting). The dissent also foresaw that the logic of *Virginia Pharmacy* would almost necessarily extend to advertising by physicians and attorneys. *Id.*, at 785. This prediction soon proved correct, see *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977), and subsequent decisions have radically curtailed the power of the States to forbid conduct that I believe "promote[s] distrust of lawyers and disrespect for our own system of justice." *Id.*, at 394 (Powell, J., concurring in part and dissenting in part).

The latest developments, in *Zauderer* and now today, confirm that the Court should apply its commercial speech doctrine with more discernment than it has shown in these cases. Decisions subsequent to *Virginia Pharmacy* and *Bates*, moreover, support the use of restraint in applying this doctrine to attorney advertising. We have never held, for example, that commercial speech has the same constitutional status as speech on matters of public policy, and the Court has consistently purported to review laws regulating commercial speech under a significantly more deferential standard of review.

> "Expression concerning purely commercial transactions has come within the ambit of the [First] Amendment's protection only recently. . . . To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik* v. *Ohio State Bar Assn., supra*, at 455–456 (footnote omitted).

A standardized legal test has been devised for commercial speech cases. Under that test, such speech is entitled to constitutional protection only if it concerns lawful activities and is not misleading; if the speech is protected, government may still ban or regulate it by laws that directly advance a substantial governmental interest and are appropriately tailored to that purpose. See *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 566 (1980). Applying that test to attorney advertising, it is clear to me that the States should have considerable latitude to ban advertising that is *"potentially* or demonstrably misleading," *In re R. M. J.*, 455 U. S. 191, 202 (1982) (emphasis added), *as well as* truthful advertising that undermines the substantial governmental interest in promoting the high ethical standards that are necessary in the legal profession.

Some forms of advertising by lawyers might be protected under this test. Announcing the price of an initial consultation might qualify, for example, especially if appropriate disclaimers about the costs of other services were included. Even here, the inherent difficulties of policing such advertising suggest that we should hesitate to interfere with state rules designed to ensure that adequate disclaimers are included and that such advertisements are suitably restrained.

As soon as one steps into the realm of prices for "routine" legal services such as uncontested divorces and personal bankruptcies, however, it is quite clear to me that the States may ban such advertising completely. The contrary decision in *Bates* was in my view inconsistent with the standard test that is now applied in commercial speech cases. Until one becomes familiar with a client's particular problems, there is simply no way to know that one is dealing with a "routine" divorce or bankruptcy. Such an advertisement is therefore inherently misleading if it fails to inform potential clients that they are not necessarily qualified to decide whether their own apparently simple problems can be handled by "routine" legal services. Furthermore, such advertising practices will

undermine professional standards if the attorney accepts the economic risks of offering fixed rates for solving apparently simple problems that will sometimes prove not to be so simple after all. For a lawyer to promise the world that such matters as uncontested divorces can be handled for a flat fee will inevitably create incentives to ignore (or avoid discovering) the complexities that would lead a conscientious attorney to treat some clients' cases as anything but routine. It may be possible to devise workable rules that would allow something more than the most minimal kinds of price advertising by attorneys. That task, however, is properly left to the States, and it is certainly not a fit subject for constitutional adjudication. Under the *Central Hudson* test, government has more than ample justification for banning or strictly regulating most forms of price advertising.

Solicitation practices like the "free sample" techniques approved by *Zauderer* and today's decision are even less deserving of constitutional protection than price advertising for supposedly routine legal services. Applying the *Central Hudson* test to the regulation at issue today, for example, I think it clear that Kentucky has a substantial interest in preventing the potentially misleading effects of targeted, direct-mail advertising as well as the corrosive effects that such advertising can have on appropriate professional standards. Soliciting business from strangers who appear to need particular legal services, when a significant motive for the offer is the lawyer's pecuniary gain, always has a tendency to corrupt the solicitor's professional judgment. This is especially true when the solicitation includes the offer of a "free sample," as petitioner's proposed letter does. I therefore conclude that American Bar Association Model Rule of Professional Conduct 7.3 (1984) sweeps no more broadly than is necessary to advance a substantial governmental interest. See *Central Hudson, supra*, at 566. The Kentucky Supreme Court correctly found that petitioner's letter could permissi-

bly be banned under Rule 7.3, and I dissent from the Court's decision to reverse that judgment.

## III

The roots of the error in our attorney advertising cases are a defective analogy between professional services and standardized consumer products and a correspondingly inappropriate skepticism about the States' justifications for their regulations. In *Bates*, for example, the majority appeared to demand conclusive proof that the country would be better off if the States were allowed to retain a rule that served "to inhibit the free flow of commercial information and to keep the public in ignorance." 433 U. S., at 365. Although the opinion contained extensive discussion of the proffered justifications for restrictions on price advertising, the result was little more than a bare conclusion that "we are not persuaded that price advertising will harm consumers." See *id.*, at 368–379. Dismissing Justice Powell's careful critique of the implicit legislative factfinding that underlay its analysis, the *Bates* majority simply insisted on concluding that the benefits of advertising outweigh its dangers. Compare *id.*, at 373, n. 28, with *id.*, at 391–400 (Powell, J., concurring in part and dissenting in part). In my view, that policy decision was not derived from the First Amendment, and it should not have been used to displace a different and no less reasonable policy decision of the State whose regulation was at issue.

*Bates* was an early experiment with the doctrine of commercial speech, and it has proved to be problematic in its application. Rather than continuing to work out all the consequences of its approach, we should now return to the States the legislative function that has so inappropriately been taken from them in the context of attorney advertising. The *Central Hudson* test for commercial speech provides an adequate doctrinal basis for doing so, and today's decision confirms the need to reconsider *Bates* in the light of that doctrine.

Even if I agreed that this Court should take upon itself the task of deciding what forms of attorney advertising are in the public interest, I would not agree with what it has done. The best arguments in favor of rules permitting attorneys to advertise are founded in elementary economic principles. See, *e. g.*, Hazard, Pearce, & Stempel, Why Lawyers Should Be Allowed to Advertise: A Market Analysis of Legal Services, 58 N. Y. U. L. Rev. 1084 (1983). Restrictions on truthful advertising, which artificially interfere with the ability of suppliers to transmit price information to consumers, presumably reduce the efficiency of the mechanisms of supply and demand. Other factors being equal, this should cause or enable suppliers (in this case attorneys) to maintain a price/quality ratio in some of their services that is higher than would otherwise prevail. Although one could probably not test this hypothesis empirically, it is inherently plausible. Nor is it implausible to imagine that one effect of restrictions on lawyer advertising, and perhaps sometimes an intended effect, is to enable attorneys to charge their clients more for some services (of a given quality) than they would be able to charge absent the restrictions.

Assuming, *arguendo*, that the removal of advertising restrictions should lead in the short run to increased efficiency in the provision of legal services, I would not agree that we can safely assume the same effect in the long run. The economic argument against these restrictions ignores the delicate role they may play in preserving the norms of the legal profession. While it may be difficult to defend this role with precise economic logic, I believe there is a powerful argument in favor of restricting lawyer advertising and that this argument is at the very least not easily refuted by economic analysis.

One distinguishing feature of any profession, unlike other occupations that may be equally respectable, is that membership entails an ethical obligation to temper one's selfish pursuit of economic success by adhering to standards of conduct

that could not be enforced either by legal fiat or through the discipline of the market. There are sound reasons to continue pursuing the goal that is implicit in the traditional view of professional life. Both the special privileges incident to membership in the profession and the advantages those privileges give in the necessary task of earning a living are means to a goal that transcends the accumulation of wealth. That goal is public service, which in the legal profession can take a variety of familiar forms. This view of the legal profession need not be rooted in romanticism or self-serving sanctimony, though of course it can be. Rather, special ethical standards for lawyers are properly understood as an appropriate means of restraining lawyers in the exercise of the unique power that they inevitably wield in a political system like ours.

It is worth recalling why lawyers are regulated at all, or to a greater degree than most other occupations, and why history is littered with failed attempts to extinguish lawyers as a special class. See generally R. Pound, The Lawyer from Antiquity to Modern Times (1953). Operating a legal system that is both reasonably efficient and tolerably fair cannot be accomplished, at least under modern social conditions, without a trained and specialized body of experts. This training is one element of what we mean when we refer to the law as a "learned profession." Such knowledge by its nature cannot be made generally available, and it therefore confers the power and the temptation to manipulate the system of justice for one's own ends. Such manipulation can occur in at least two obvious ways. One results from overly zealous representation of the client's interests; abuse of the discovery process is one example whose causes and effects (if not its cure) is apparent. The second, and for present purposes the more relevant, problem is abuse of the client for the lawyer's benefit. Precisely because lawyers must be provided with expertise that is both esoteric and extremely powerful, it would be unrealistic to demand that clients bargain for their

services in the same arm's-length manner that may be appropriate when buying an automobile or choosing a dry cleaner. Like physicians, lawyers are subjected to heightened ethical demands on their conduct towards those they serve. These demands are needed because market forces, and the ordinary legal prohibitions against force and fraud, are simply insufficient to protect the consumers of their necessary services from the peculiar power of the specialized knowledge that these professionals possess.

Imbuing the legal profession with the necessary ethical standards is a task that involves a constant struggle with the relentless natural force of economic self-interest. It cannot be accomplished directly by legal rules, and it certainly will not succeed if sermonizing is the strongest tool that may be employed. Tradition and experiment have suggested a number of formal and informal mechanisms, none of which is adequate by itself and many of which may serve to reduce competition (in the narrow economic sense) among members of the profession. A few examples include the great efforts made during this century to improve the quality and breadth of the legal education that is required for admission to the bar; the concomitant attempt to cultivate a subclass of genuine scholars within the profession; the development of bar associations that aspire to be more than trade groups; strict disciplinary rules about conflicts of interest and client abandonment; and promotion of the expectation that an attorney's history of voluntary public service is a relevant factor in selecting judicial candidates.

Restrictions on advertising and solicitation by lawyers properly and significantly serve the same goal. Such restrictions act as a concrete, day-to-day reminder to the practicing attorney of why it is improper for any member of this profession to regard it as a trade or occupation like any other. There is no guarantee, of course, that the restrictions will always have the desired effect, and they are surely not a sufficient means to their proper goal. Given their inevita-

ble anticompetitive effects, moreover, they should not be thoughtlessly retained or insulated from skeptical criticism. Appropriate modifications have been made in the light of reason and experience, and other changes may be suggested in the future.

In my judgment, however, fairly severe constraints on attorney advertising can continue to play an important role in preserving the legal profession as a genuine profession. Whatever may be the exactly appropriate scope of these restrictions at a given time and place, this Court's recent decisions reflect a myopic belief that "consumers," and thus our Nation, will benefit from a constitutional theory that refuses to recognize either the essence of professionalism or its fragile and necessary foundations. Compare, *e. g.*, *Bates*, 433 U. S., at 370–372, with *id.*, at 400–401, and n. 11 (Powell, J., concurring in part and dissenting in part). In one way or another, time will uncover the folly of this approach. I can only hope that the Court will recognize the danger before it is too late to effect a worthwhile cure.