ON APPLICATION FOR REHEARING
The opinion of December 15, 1995, is withdrawn and the following opinion is substituted therefor.
Two attorneys appeal from Alabama State Bar disciplinary proceedings. They challenge the sufficiency of the evidence presented at their disciplinary hearing, claiming that the disciplinary proceeding was nothing more than a "witch-hunt" that they say the Bar conducted because it did not approve of the attorneys' advertising practices. They further challenge the penalties imposed as being too severe.
The Alabama State Bar Disciplinary Board found William Dowsing Davis III and Dan Arthur Goldberg to be violating Rule 1.1, Alabama Rules of Professional Conduct (failure to provide competent representation); Rule 1.4(a) and (b) (failure to keep clients reasonably informed and failure to reasonably explain a matter so as to permit a client to make an informed decision); Rule 5.1 (failure to make reasonable efforts to ensure that the lawyers in their firm conformed to the Rules of Professional Conduct); Rule 5.3(b) (failure to ensure that the activities of a nonlawyer under an attorney's supervision are compatible with professional standards); Rule 5.5(b) (providing assistance to a person engaging in the unauthorized practice of law); Rule 8.4(a) (violation of the Rules of Professional Conduct through the acts of another); Rule 8.4(d) (engaging in conduct prejudicial to the administration of justice); and Rule 8.4(g) (engaging in conduct that adversely reflects on a lawyer's fitness to practice law). Both of the attorneys were suspended from the practice of law for 60 days.
The record before this Court is voluminous. Several former and present attorneys and secretaries of these attorneys' firm testified at the disciplinary hearing. Several clients of the firm also testified.
These two attorneys were the sole partners in the law firm of Davis Goldberg. The firm spent approximately $500,000 annually on advertising, primarily television advertising, and the advertising attracted a large number of clients. As a result of this large expenditure and the volume of clients produced by the advertising, the attorneys implemented several policies, described below, designed to minimize expenses and maximize profits.
The Bar presented evidence, for example, that Davis and Goldberg allowed nonlawyer secretaries to provide legal services. It was also shown to be common practice at the firm for secretaries to interview clients and prepare legal filings, especially bankruptcy petitions. Evidence also indicated that nonlawyer staff members gave clients legal advice, such as "informing" clients of the differences between Chapter 7 and Chapter 13 bankruptcy. One former associate attorney testified that it was the firm's practice that attorneys would not interview or have any contact with the client before the first scheduled court appearance.
There was further testimony that these two attorneys imposed unmanageable caseloads on associate attorneys, many of whom were inexperienced. Some associate attorneys, for example, maintained caseloads of nearly 600 active cases. Former associates testified that because of the sheer volume of cases, the amount of time that could be spent on each case was so limited as to make it *Page 308 
impossible for them to adequately represent their clients. At the hearing before the Disciplinary Board, the attorneys' own expert witness on Social Security law, Charles Tyler Clark, testified that the Social Security caseload, as described by a former associate of the firm, could not have been adequately handled by the one attorney assigned to it.
There was testimony that the firm had an inadequate supply of filing cabinets for case files and that files were simply stacked in various parts of the office, including the employees' break room and the hallway near the bathrooms. The evidence further tended to show that associate attorneys were given the barest of support staffs and that this fact, coupled with the huge volume of cases imposed upon the associates, created a situation in which files were mishandled, resulting in harm to the interests of clients.
The harm resulting from what could be described as a practice of the firm is best illustrated in the testimony of a former client, Brenda Marie Wood. Her husband, Douglas Wayne Wood; suffers from acute peripheral neuropathy and is dying. He was awarded Social Security disability benefits, but did not begin receiving his payments until eight months after he was supposed to. Mr. and Mrs. Wood saw a Davis Goldberg television commercial that promised that the firm would "cut through the Social Security red tape" and get its clients' Social Security benefits fast. Because of the statement made in the advertisement, Mr. Wood hired the firm of Davis Goldberg in October 1991 to represent him in his claim for past-due benefits. The firm lost Wood's file three times, and each time Wood was required to fill out a new set of forms. Wood was continuously assured by the firm's staff that his claim had been filed, when in fact it had not been. In February 1992, Wood received a letter from the firm informing him that the deadline for filing the claim had passed, and that it was too late to file his appeal.
The associates employed by Davis Goldberg were also subjected to policies that interfered with their adequate and professional representation of their clients. These policies included the imposition of time limits or restrictions on the amount of time that they could spend with clients and on cases; the imposition of a quota system that required associates to open a specified number of files in a certain time period; and the imposition of a policy requiring associates not to return the phone calls of existing clients, so that the attorneys could free more time to sign new clients.
The appellants contend that the Bar did not meet its burden of proof as to the allegations against them. The standard of review applicable to an appeal from an order of the Disciplinary Board is "that the order will be affirmed unless it is not supported by clear and convincing evidence or misapplies the law to the facts." Noojin v. Alabama State Bar,577 So.2d 420, 423 (Ala. 1990), citing Hunt v. DisciplinaryBoard of the Alabama State Bar, 381 So.2d 52 (Ala. 1980). We disagree with the attorneys' claims that the evidence was insufficient. In fact, the evidence presented amply showed that the two attorneys, in an effort to turn over a huge volume of cases, neglected their clients and imposed policies on associate attorneys that prevented the attorneys from providing quality and competent legal services. The evidence more than met the clear and convincing standard, and the Board's findings that these lawyers had violated the Rules of Professional Conduct are due to be affirmed.
Even though we affirm the findings that these lawyers had violated the Rules of Professional Conduct, we elect to address their argument that the disciplinary proceeding amounted to a "witch-hunt" conducted because the Bar does not approve of the firm's advertising practices. We reject this contention. Instead, we find that the Disciplinary Board properly fulfilled its role of being a guardian of the image of the legal profession, and, thus, acted as a guardian of the profession itself.[1] We cannot find, as the *Page 309 
attorneys ask us to find, that the Bar was conducting a "witch-hunt." In fact, there was evidence that the Bar examined the attorneys' advertising practices; it could have found that their advertisements were misleading, specifically in that the attorneys did not provide the quality legal service advertised. The Disciplinary Board heard evidence that one specific advertisement was misleading as it related to a United States Supreme Court ruling on the availability of Social Security benefits. Even the appellants' expert witness testified that the advertisement could have been misleading under certain circumstances.[2]
This Court recognizes that attorneys have a First Amendment right to engage in various forms of commercial speech.[3] We uphold the discipline imposed upon these attorneys, but we are not upholding it because they advertised; rather, we uphold it because the advertising was misleading in that the attorneys did not provide what they said they would provide. False and misleading advertising by attorneys can, and probably has, greatly harmed the public's perception of the legal profession, at a time when the public's confidence in attorneys has diminished. Indeed, the vast majority of those in the legal profession think advertising is harmful to the image of attorneys.[4]
Justice O'Connor warned in her dissent in Shapero v. KentuckyBar Ass'n, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475
(1988), that the advertising practices of some attorneys, similar to those practices followed by these two attorneys, will "undermine professional standards" by giving an attorney "incentives to ignore (or avoid discovering) the complexities that would lead a conscientious attorney to treat some clients' cases as anything but routine."[5] 486 U.S. at 486,108 S.Ct. at 1928. (For further discussion of *Page 310 
Justice O'Connor's dissent, see notes 1 and 5.)
Evidence was presented that these two attorneys placed advertisements that were false and misleading. There can be no constitutional right to advertise in a false and misleading way. The evidence tends to show that these two attorneys' ethical violations were caused by their advertising practices and desire to turn over a huge volume of cases. The harm caused by this practice seems apparent.
Additionally, this Court finds no error or abuse in regard to the sanction the Board imposed, a 60-day suspension of the licenses of Davis and Goldberg. The violations were serious, and we cannot hold that the Board acted improperly in imposing the punishment. Consequently, the orders of the Disciplinary Board are affirmed.
In their application for rehearing, the attorneys argue that in its opinion of December 15, 1995, the Court erred in upholding the disciplinary sanctions based solely on allegations of misleading or false advertising. They are apparently referring to the Board's acquittal as to the charge of violating Rule 7.1, Alabama Rules of Professional Conduct. The Court affirmed the Disciplinary Board's numerous findings of violations of ethical rules, but did not address the Board's acquittal of the alleged violation of Rule 7.1. Instead, the Court addressed the attorneys' contention that the Disciplinary Board had conducted a "witch-hunt" against them because the Board did not approve of their advertising policies.
However, the Disciplinary Board found the attorneys in violation of Rule 8.4(g), which states:
"It is professional misconduct for a lawyer to
". . . .
 "(g) Engage in any other conduct that adversely reflects on his fitness to practice law."
As we have stated earlier, much evidence was presented at the disciplinary hearing that proved that the attorneys' advertising practices and the procedures and policies adopted by Davis Goldberg adversely affected the attorneys' ability to practice law in the manner required by the Rules of Professional Conduct. Further, Rule 8.4(g) is broad enough to require that attorney advertisements be honest and accurate and that an attorney's practice of law centered around such heavy advertisement be professional and competent as generally required by the Rules of Profession Conduct.
The evidence presented to the Disciplinary Board showed that Davis Goldberg advertised that the firm provided legal services of a very high standard, but that the firm's representation of its clients failed to meet the high standard presented in its advertising. This evidence of a failure on the part of Davis Goldberg to do what was promised in its advertisements, taken with the evidence regarding harmful policies and practices adopted by the firm in response to the fact that a large number of clients were attracted to the firm by its advertising practices, is more than sufficient to support the Board's finding that the attorneys violated Rule 8.4(g).
1940686 and 1940687 — OPINION OF DECEMBER 15, 1995, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
HOOPER, C.J., and HOUSTON, KENNEDY, INGRAM, and BUTTS, JJ., concur.
[1] Justice O'Connor described the need for such protection in her dissent in Shapero v. Kentucky Bar Ass'n, 486 U.S. 466, 488-89,108 S.Ct. 1916, 1929-30, 100 L.Ed.2d 475 (1988):
 "One distinguishing feature of any profession, unlike other occupations that may be equally respectable, is that membership entails an ethical obligation to temper one's selfish pursuit of economic success by adhering to standards of conduct that could not be enforced either by legal fiat or through the discipline of the market. There are sound reasons to continue pursuing the goal that is implicit in the traditional view of professional life. Both the special privileges incident to membership in the profession and the advantages those privileges give in the necessary task of earning a living are means to a goal that transcends the accumulation of wealth. That goal is public service, which in the legal profession can take a variety of familiar forms. This view of the legal profession need not be rooted in romanticism or self-serving sanctimony, though of course it can be. Rather, special ethical standards for lawyers are properly understood as an appropriate means of restraining lawyers in the exercise of the unique power that they inevitably wield in a political system like ours."
[2] During the cross-examination of Charles Tyler Clark at the Bar disciplinary hearing, the following testimony was presented:
 "MR. KENDRICK: This tape that we just listened to on the commercial, the last part of it, if I wrote it down correctly, says, 'Remember, no fee unless we collect. If you received a notice from Social Security or think you were wrongfully denied benefits, call Davis Goldberg.' Now, if somebody just listened to the last half of that tape, they wouldn't have [an] idea that they were talking about children's denial of Social Security benefits, would they?
 "MR. NORTH: Mr. Chairman, I object to the last half of the tape. The tape as a whole.
 "THE CHAIRMAN: I understand. But I'll let him answer the question. I understand the tape.
 "MR. KENDRICK: If somebody walked in the room and turned the TV on and only caught the last half of it, they wouldn't understand that those cases were limited to children — denial of children's benefits, would they? "
"MR. TYLER: That would be correct."
[3] This Court recognizes — and has ruled consistently with the United States Supreme Court regarding — the constitutionality of attorney advertising that is not "false, deceptive, or misleading." Zauderer v. Office of Disciplinary Counsel,471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985);also see Bates v. State Bar of Arizona, 434 U.S. 881,98 S.Ct. 242, 54 L.Ed.2d 164 (1977), and Alabama State Bar Ass'n v. R.W.Lynch Co., 655 So.2d 982 (Ala. 1995).
[4] In a Gallup poll conducted in November 1993 for the ABAJournal, 87% of the attorneys polled stated that they think legal advertising has harmed the public image of attorneys. James Podgers, ABA Journal, Feb. 1994, 66-72.
[5] Justice O'Connor went on to state:
 "[B]ecause lawyers must be provided with expertise that is both esoteric and extremely powerful, it would be unrealistic to demand that clients bargain for their services in the same arm's-length manner that may be appropriate when buying an automobile or choosing a dry cleaner."
486 U.S. at 489-90, 108 S.Ct. at 1930.