Michael **WALKER**, Ernie Heffner, Jefferson Memorial Funeral Home and Betty Frey, Plaintiffs,

v.

Jodi **FLITTON**, Joseph A. Fluehr, III, Michael J. Yeosock, Janice Mannal, Anthony Scarantino, Michael D. Morrison, Donald J. Murphy, and James O. Pinkerton, Defendants.

No. 4:cv–01–02252.

United States District Court, M.D. Pennsylvania.

April 14, 2005.

Allen C. Warshaw, Klett Rooney Lieber & Schorling, Harrisburg, PA, James J. Kutz, Barbara A. Zemlock, Post & Schell, P.C., Camp Hill, PA, for Plaintiffs.

Sarah C. Yerger, Office of Attorney General, Harrisburg, PA, for Defendants.

## MEMORANDUM AND ORDER

JONES, District Judge.

Pending before the Court are a Motion for Summary Judgment (Rec.Doc.30) filed by the Plaintiffs Michael Walker, Ernie Heffner, Jefferson Memorial Funeral Home, and Betty Frey ("Plaintiffs"), which seeks a declaratory judgment against the Defendants, Jodi Flitton, Joseph A. Fluehr, III, Michael J. Yeosock, Janice Mannal, Anthony Scarantino, Michael D. Morrison, Donald J. Murphy, James O. Pinkerton, ("Defendants" or "Board members") and a Motion for Summary Judgment (Rec.Doc.34) filed by the Defendants seeking dismissal of Plaintiffs' action.[1] The aforementioned Defendants are all members of the Pennsylvania Board of

---

1. In our Order dated October 28, 2004, we granted Plaintiffs' Motion to Amend/Correct the Complaint so that former members of the Board were substituted as Defendants by their replacements. Defendants Anthony Scarantino and Michael J. Yeosock have replaced Andrew Mamary and Gary L. Morrison. (Rec. Doc.45). This action is brought against the individual members of the Board because any action against the Board itself would be barred by the Eleventh Amendment. The Supreme Court has enumerated three exceptions to Eleventh Amendment immunity which will allow a suit against the state: (1) congressional abrogation; (2) state waiver; and, (3) suits against individual state officers for prospective relief to end ongoing violations of federal law. See MCI Telecomm. Corp. v. Bell Atlantic–Pennsylvania, 271 F.3d 491, 503 (3d Cir. 2001). The third exception refers to the Ex Parte Young doctrine that allows suits for vio-

Funeral Directors and are named parties in their official capacities as members of that Board. Plaintiff Ernie Heffner is a licensed funeral director at Plaintiff Jefferson Memorial Funeral Home, which employs Plaintiffs Betty Frey and Michael Walker, the former through a subsidiary, Preneed Associates, Inc.[2] Both Frey and Walker are licensed insurance salespersons but are not licensed funeral directors.

This Court has jurisdiction over the individual Board members based on federal question jurisdiction pursuant to 28 U.S.C. § 1331 as this action for declaratory relief is brought pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act codified at 28 U.S.C. § 2201.

For the reasons stated below, we will grant Plaintiffs' Motion for Summary Judgment insofar as we will afford the Plaintiffs declaratory relief. The Defendants' Motion for Summary Judgment will be denied and this case closed.

### PROCEDURAL HISTORY:

On November 27, 2001, Plaintiffs filed a complaint against the Defendants, who at that time were the members of the Pennsylvania State Board of Funeral Directors (the "Board").[3] In their complaint, Plaintiffs argue that their First Amendment right to free speech has been violated insofar as the Defendants have taken affirmative steps to restrict Plaintiffs' ability to have unlicensed funeral directors distribute price lists of funeral services and to interact with customers interested in preneed funeral services.[4] (Cmplt.¶ 1). According to the Plaintiffs, the Defendants' actions have restricted their ability to allow unlicensed individuals to solicit preneed funeral plan customers or to distribute accurate funeral price lists to those customers. They argue that these restrictions violate their right to free speech under the United States Constitution. Defendants contest this, arguing that the speech at issue is not entitled to First Amendment protections.

### A. Defendants' Motion to Dismiss

The Board filed a Motion to Dismiss on January 28, 2002. On September 24, 2002, this Court granted Defendants' Motion to Dismiss on the basis of the *Rooker–Feldman* doctrine. (*See* Rec. Doc. 11). *See Dist. of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 486–87, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923).[5] The Third Circuit reversed, holding that, "*Rooker-Feld-*

---

lations of the Constitution and federal statutes against individual state officers. *See* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also MCI Telecomm. Corp.*, 271 F.3d at 506 (defining *Ex Parte Young* doctrine). It is the third exception that is relevant to our inquiry here.

2. Preneed Associates, Inc. is not a party to this action.

3. This case was originally on the docket of our colleague Judge James F. McClure. In an Order dated August 6, 2002, the action was transferred to us. (*See* Rec. Doc. 10).

4. In the context of this case, the conduct at issue involves licensed insurance salespersons distributing information to consumers at the direction of their employers or principals, who are licensed funeral directors. The goal of the insurance salesperson is to have the prospective customer enter into a contract with the licensed funeral director for future funeral services to be provided at the time of death, funded by a life insurance policy purchased by the customer. This policy is to be held in trust by the funeral director with whom the customer contracts, and who will provide the eventual funeral services. It is undisputed that a license issued by the Pennsylvania Insurance Department is necessary to sell the life insurance policies and so when we refer to individuals who are "unlicensed" or "non-licensed" we mean that they lack a funeral director's license in Pennsylvania.

5. "[T]he fundamental principle of the *Rooker-Feldman* doctrine [is] that a federal district

*man* does not bar individual constitutional claims by persons not parties to earlier state court litigation." *Walker v. Flitton,* 66 Fed.Appx. 442, 444 (3d Cir.2003)(*quoting FOCUS v. Allegheny County Ct. of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1996)(other internal citations omitted)). (Rec.Doc.16). The case was remanded to this Court where, following oral argument, the Defendants' Motion to Dismiss was denied on the merits. (*See* Rec. Doc. 21).

## B. Discovery and the Basis for the Cross Motions for Summary Judgment

Following the remand and our subsequent denial of Defendants' Motion to Dismiss, we stated in our Order of October 7, 2003 that "we will revisit the merits of this dispute after the parties have had the opportunity to develop more fully a factual record, either by stipulation or discovery." (Rec. Doc. 21 at 6). Since the time of that Order, not only have the parties developed the factual record, but the Defendants made what we view as a misguided attempt to render this case moot. Specifically, the Board members unanimously repealed this resolution that was, in their view, the central focus of Plaintiffs' litigation. This **non-binding** resolution, first enacted by the Board on September 1, 1999, and repealed on May 5, 2004 states:

> The State Board of Funeral Directors believes that the showing, distribution or summarization of any price list of a specific funeral home or any explanation of the funeral services or merchandise available from any specific funeral home for any commercial purpose whatsoever, except as may be specifically necessary to comply with Regulations of the Federal Trade Commission, for funeral services needed for a person then living,

constitutes the practice of funeral directing by engaging in pre-need sales. Section 13(a) of the [Funeral Director] Law limits this practice to licensed funeral directors. The Board may consider it to be unprofessional conduct for any funeral director to authorize or permit any such activity constituting the practice of funeral directing.

Defs.' SMF at 8 (the "Resolution"). Oral argument on the question of mootness was held December 23, 2004. On January 13, 2005, we issued an Order denying Defendants' Motion for Summary Judgment in part and holding that this action presented a facial challenge to a state regulation, namely the actions of the Board in interpreting Pennsylvania's Funeral Director Law (the "Law"), and therefore was not moot. (Rec.Doc.51); 63 Pa. Cons.Stat. §§ 471–80.

Specifically, we held that "It is clear to us that there is every reason to believe that the Board, despite having rescinded the Resolution, still considers the Plaintiffs' conduct in question to be prohibited by the Pennsylvania Funeral Director Law." *Id.* at 13. *See Guardian Plans v. Teague,* 870 F.2d 123 (4th Cir.1989)(determining that a challenge to a Virginia funeral services regulation prior to an attempt to enforce the regulation could proceed because of the threat to the plaintiffs' First Amendment rights). Furthermore, we noted that despite the rescission, the Board has continually failed to clarify to funeral directors and their unlicensed employees and agents what conduct was legal and what remained barred. We viewed Plaintiffs' claims as a facial challenge to the Board members' interpretation and application of the Law.

However, our determination that the Plaintiffs have standing is distinct from

court may not sit as an appellate court to adjudicate appeals of state court proceedings." *Port Auth. Police Benevolent Assoc.,*

*Inc. v. Port Auth. of N.Y. and N.J. Police Dept.,* 973 F.2d 169, 179 (3d Cir.1992).

and not dispositive of their substantive First Amendment challenge. *See Nat'l Council for Improved Health v. Shalala,* 122 F.3d 878, 881 (10th Cir.1997)(holding that a determination that plaintiffs bringing a First Amendment challenge have standing is separate from a determination on the merits of that action). Having determined that Plaintiffs' action is not moot, we are now able address the merits of their claims pursuant to 42 U.S.C. § 1983 requesting declarative relief.

### STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Turner v. Schering–Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." *Young v. Quinlan,* 960 F.2d 351, 357 (3d Cir.1992). Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder could draw from them. *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982).

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325, 106 S.Ct. 2548.

Federal Rule of Civil Procedure 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. FED.R.CIV.P. 56(e). The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore v. Bell Tel. Co. of Pa.,* 24 F.3d 508, 511 (3d Cir.1994) (internal citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993) (citations omitted).

Still, "the mere existence of **some** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(emphasis in original). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248, 106 S.Ct. 2505. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### STATEMENT OF RELEVANT FACTS:

This case involves the extent to which non-licensed individuals can interact with customers regarding preneed funeral plans and how these individuals can market those plans to potential customers, specifically via accurate price lists. As noted, Plaintiff Ernie Heffner is a licensed funer-

al home director, Plaintiff Michael Walker is a licensed insurance salesperson who sells life insurance policies that cover funeral expenses, and Plaintiff Betty Frey is also a licensed insurance salesperson. Both Walker and Frey are employees of Heffner and Jefferson Memorial Funeral Home. As noted, it is undisputed that Walker and Frey are not licensed funeral directors. Together, the Plaintiffs are requesting declaratory relief in order to prevent the Board from initiating enforcement action(s) that would limit Plaintiffs' rights to disseminate information about preneed funeral services as well as their ability to interact with consumers. The Defendants argue that their conduct as well as the Resolution, which the Defendants believe remains an accurate statement of the Law, does not impermissibly infringe on the Plaintiffs' free speech rights. As the factual basis which has brought this case before us is quite complicated, we will now proceed to explain it, as well as certain historical references, in some detail.

### A. Plaintiffs' Action and Preneed Sales Prior to the Board's Adoption of the Resolution

The Defendants believe and accordingly assert that their Resolution was merely a proper interpretation of the Law. Therefore, we first will examine what the Law dictates regarding preneed services. Next, we will examine the state court's interpretation of the Law and the Resolution, and finally we discuss the impact of this on the Plaintiffs and others similarly situated.

### 1. The Funeral Director Law, 63 Pa. Cons.Stat. §§ 471–80

In 1952, the Pennsylvania General Assembly enacted what is known as the Funeral Director Law ("Law"). *See* 63 Pa. Cons.Stat. §§ 471–80.[6] The Law details numerous aspects of funeral directing, most of which are not relevant to our inquiry here.[7] The relevant portion of the Law includes the creation of the Board of

---

**6.** Act of January 14, 1952, P.L. (1951) 1898, as amended, 63 Pa. Cons.Stat. §§ 471–80.

**7.** Most of the statute is rightly concerned with the risks to public health if dead bodies are not properly cared for by licensed individuals, the specific requirements for obtaining and maintaining a funeral director license, as well as creating an entity to manage the administration of the Law; namely, the Board of Funeral Directors. *See* 63 Pa.Stat. § 479. Similarly, our analysis of the relevant legislative history both when the Law was passed in 1952, and later amended in 1953 and 1968 shows that while preneed service are incorporated in the law, the Pennsylvania General Assembly never debated these provisions. *Id.* § 480 (providing provisions for preneed trust funds and other fiduciary rules). Rather, it seems that the legislative debate, particularly in 1968, was primarily concerned with the definition of the term "funeral establishment" and how it relates to the ability of a funeral home to serve food and beverages. For obvious reasons, the General Assembly did not want food served in the same room in which corpse preparation was done, but did not want to wholly prohibit the serving of food. The Law thus allows the Board to inspect only the areas in which corpses are prepared. *See Legislative Journal,* House, June 4, 1967 at 684–90 (*e.g.,* remarks of Mr. Zimmerman and Mr. Bennett).

In the legislative history there is only the briefest of discussions relevant to our inquiry here. Specifically, the following interchange: Mr. Coppolino: Mr. Speaker, I speak directly to this point, that in Philadelphia, ... with people of Italian descent, during the past 20 years there have been burial associations and burial certificate plans. These plans were paid for weekly, monthly or yearly by the first immigrants who came to this country. As we progressed, we learned that a particular funeral director was not the one that the family would like to use for one reason or another and the particular funeral director refused to repay this money or to provide materials to be used in a burial. For this reason, I direct your attention to this because I think that this method is wholly unacceptable to any family in the Commonwealth, and I would like to have

Funeral Directors which is tasked with "the enforcement of this [A]ct." *Id.* at § 479.16(a); *see also* § 479.19 (establishing the Board and explaining who its members will be). In enforcing the Law, the Board:

shall be empowered to formulate necessary rules and regulations not inconsistent with this act for the proper conduct of the business or profession of funeral directing and as may be deemed necessary or proper to safeguard the interests of the public and the standards of the profession.

*Id.* Additionally, § 479.13 prescribes when it is permissible for individuals to practice funeral directing without a license, and what duties constitute the practice of funeral directing:

(a) No person shall practice as a funeral director as defined herein, in this Commonwealth unless he holds a valid license so to do as provided in this act.[8]

.  .  .  .  .

(b) No person other than a licensed funeral director or a resident interne shall prepare or embalm the body of any deceased person.

**(c) No person other than a licensed funeral director shall, directly or indirectly, or through an agent, offer to or enter into a contract with a living person to render funeral services to such person when needed.** If any such licensed funeral director shall accept any money for such contracts, he shall, forthwith, either deposit the same in an escrow account in, or transfer the same in trust to, a banking institution in this Commonwealth, conditioned upon its withdrawal or disbursement only for the purposes for which such money was accepted. This subsection does not apply to a contract by a bona fide institution that it will provide professional funeral services for persons who may die while inmates of the institution, if such contract is made as a part of its contract for housing, maintaining and caring for its inmates.

(d) Tentative funeral arrangements after a death has occurred can be made by an **unlicensed member of the funeral home staff** in the event the licensed funeral director is temporarily absent.

63 Pa.Stat. § 479.13 (emphasis added). The Law thus forbids unlicensed individuals from offering for sale or entering into a preneed funeral plan contract under sub-

---

your specific assurance today, before I vote for this bill, that these plans or certificates or schemes will no longer plague our people of South Philadelphia.

Mr. Zimmerman: Mr. Speaker, the only ones of those certificates, plans or burial associations which are in effect today were those that were started before this was taken care of in the funeral director law of 1952....

*Id.* at 690 (remarks of Mr. Coppolino and Mr. Zimmerman). There is a concern evidenced by this and other exchanges in the legislative history that these burial association plans had taken advantage of immigrants. Inasmuch as this was a concern of the General Assembly, we note that the Law provides strict requirements for keeping preneed funds in trust and this aspect of preneed plans is not before us.

8. The Law defines "funeral director" as:

(1) The term "funeral director" shall include any person engaged in the profession of a funeral director or in the care and disposition of the human dead, or in the practice of disinfecting and preparing by embalming the human dead for the funeral service, burial or cremation, or the supervising of the burial, transportation or disposal of deceased human bodies, or in the practice of funeral directing or embalming as presently known, whether under these titles or designation or otherwise. The term "funeral director" shall also mean a person who makes arrangements for funeral service and who sells funeral merchandise to the public incidental to such service or who makes financial arrangements for the rendering of such services and the sale of such merchandise.

63 Pa.Stat. § 479.2(1).

part (c). However, under subpart (d), unlicensed individuals are permitted to make tentative funeral arrangements in the event that the licensed funeral director for whom they work is temporarily unavailable. Therefore, although the Law prohibits unlicensed individuals from offering for sale preneed contracts, these same unlicensed individuals are permitted to make tentative funeral arrangements in certain situations.

The Law also defines what constitutes the practice of funeral directing: A person, either individually or as a member of a partnership or of a corporation, shall be deemed to be practicing as a funeral director within the meaning and intent of this act who:

(1) holds himself out to the public in any manner as one who is skilled in the knowledge, science and practice of funeral directing, embalming or undertaking, or who advertises himself as an undertaker, mortician or funeral director.

(2) permits, either as lessee, employe, [sic] associate, or in any capacity whatsoever, the illegal operation of an establishment or enterprise of any character or description whereby the public is led to believe that therein is offered or available funeral directing or undertaking services or facilities.

*Id.* at § 479.15.

Finally, the Board's jurisdiction extends to those who act as funeral directors but are not licensed as such. *See* 63 Pa.Stat. § 479.14(c)("No person shall attempt to practice under guise of a license").

### 2. *The Plaintiffs' Conduct Prior to the Resolution*

According to the Plaintiffs, prior to the Board's adoption of the Resolution, Walker and Frey both "made themselves available to answer questions posed by consumers concerning funeral/cemetery merchandise and services, along with funding options, available from their respective employe[r]s." (Pls.' Br. Supp. Pls.' Mot. Summ. J. at 3). Both worked under the direct supervision of Heffner and with the full authorization of Heffner and Jefferson Memorial. Frey and Walker submit, and the Defendants do not contest, that at all times they provided "truthful, honest, and accurate information to consumers" despite their lack of formal training as funeral directors. *Id.* at 4.

### B. *The Resolution and its Effect on the Plaintiffs*

At the time this action was filed, the Resolution was in effect. As noted, it has since be withdrawn by the Board. Both the Resolution and subsequent statements by certain Board members have caused the Plaintiffs to significantly alter their conduct as it relates to preneed funerals.

### 1. *The Resolution*

On September 1, 1999, at the Board meeting enacting the Resolution, Defendant Pinkerton stated, "I think this[, unlicensed individuals involved in the sale of preneed funeral services,] is a festering problem that we need to provide Board insight, oversight and direction." (Pls.' Br. Supp. Mot. Summ. J. at 5). There is no evidence in the Record, however, disclosing the nature of this "festering problem" other than this one unsubstantiated opinion of Pinkerton. During discovery, no other Defendant stated that they had any evidence of the "festering problem." For example, each Defendant was asked to answer the following interrogatory propounded by Plaintiffs:

Did you alone, or in conjunction with another person, board or agency, conduct, perform or otherwise know of any studies, reports, analyses, statistics, communications or other documents which concern or relate to consumer

confidence and/or consumer injury with regard to unlicensed sale of pre-need [funeral] insurance, plans and services? . . .

(Pls.' R. at 289, *et. seq.*). In answering this question, none of the Defendants put forth any evidence that consumers had been harmed by the unlicenced sale or solicitation of preneed funeral services.[9]

After passage of the Resolution, the Board initiated two adjudications. In the first, they cited a funeral director for assisting an unlicensed individual in distributing price lists.[10] (Faye Morey, Bd. Doc. No. 0103–58–1999 (2000)). In the second adjudication, the Board held that an unlicensed individual who distributes these prices lists had engaged in the unlicensed practice of funeral directing. (Andrew D. Ferguson, III, Bd. Docket No. 0582–48–1999 (2000)).

### 2. *The Commonwealth Court's Decision in Ferguson v. Penna. State Bd. of Funeral Dirs.*

The above-referenced adjudications by the Board were appealed directly to the Commonwealth Court of Pennsylvania. *See Ferguson v. Penna. State Bd. of Funeral Dirs.*, 768 A.2d 393 (Pa.Cmwlth. 2001). In *Ferguson,* the Commonwealth Court affirmed an order by the Board instructing Fay Morey, a licensed insurance salesperson, to cease and desist from selling preneed insurance policies and also fined her $4,000. In addition, the Commonwealth Court upheld the suspension by the Board of the funeral directing license of Andrew D. Ferguson, III for two years as well as a $4,000 fine for "gross incompetency, negligence or misconduct in the carrying on of the [funeral directing] profession." *Id.* at 395 (*quoting* 63 Pa Cons.Stat. § 479.11(a)(5)). Ferguson's malfeasance, according to the Board, was that he aided and abetted Morey in her unlicensed practice of funeral directing.

The conduct giving rise to the Board's sanctions and as affirmed in *Ferguson* is close to what the instant Plaintiffs did or attempted to do prior to the adoption by the Board of the Resolution. However, we note that the unlicensed Plaintiffs here,

---

**9.** Defendant Fluehr answered this question "No." (Pls.' R. at 290); Defendant Flitton answered "I can not recall at this time. By way of clarification, discussion pertaining to these matters and issues should be contained in the [B]oard minutes." (Pls.' R. at 297); Defendant Pinkerton answered "No." (Pls.' R. at 306); Defendant Michael Morrison responded "No." (Pls.' R. at 314); Defendant Gary Morrison answered "No." (Pls.' R. at 314); Defendant Mannal responded "No." (Pls.' R. at 328); former Defendant Mamary responded "No." (Pls.' R. at 336); Defendant Murphy responded "No." (Pls.' R. at 342). Although, as previously noted, we have substituted some of these Defendants with their contemporaries now on the Board, we have no reason to believe that the newly substituted Defendants would have a different answer to this question (Defendants Scarantino and Yeosock were not deposed, as they were substituted as named Defendants after discovery in this action ceased).

**10.** Pursuant to the Federal Trade Commission's ("FTC") Funeral Rule, all funeral homes are required, *inter alia,* to have an enumerated price list detailing charges for each service and good offered for sale by that funeral home. See 16 C.F.R. § 453.2(a), which provides:

in selling or offering to sell funeral goods or funeral services to the public, it is an unfair or deceptive act or practice for a funeral provider to fail to furnish accurate price information disclosing the cost to the purchaser for each of the specific funeral goods and funeral services used in connection with the disposition of deceased human bodies, including at least the price of embalming, transportation of remains, use of facilities, caskets, outer burial containers, immediate burials, or direct cremations, to persons inquiring about the purchase of funerals.

It is this price list that the unlicensed Plaintiffs want permission to distribute.

unlike the unaffiliated parties in *Ferguson*, are **employed** by a licensed funeral director. *Ferguson* appellant Morey, a licensed insurance saleswoman, sold preneed funerals in Uniontown, Pennsylvania as an employee of Baltimore Life Insurance Company, but not, as noted, as an employee or agent of a specific funeral home. Morey would have customers complete an "Estimated Worksheet" that listed charges for each of the pieces of a burial (e.g., costs for a casket, a death certificate, a hairdresser, flowers, etc.). *Id.* at 396.[11] Afterwards, Morey would assign these agreements, with their estimated total cost of the funeral and specific charges for each item purchased, to funeral director Ferguson (and other funeral directors), who would prepare a "Statement of Funeral Goods and Services" for the insured. Ferguson and the other funeral directors would then individually visit the customers and obtain their signatures on these statements. *Id.*

■ On appeal, the Commonwealth Court examined the Board's actions to see whether it had acted in a manner inconsistent with the Law. *Id.* (*citing McKinley v. State Bd. of Funeral Dirs.*, 11 Pa.Cmwlth. 241, 313 A.2d 180 (1973)(holding that the Board must be given deference in the interpretation of its rules and regulations)). The Commonwealth Court's review of the Board's decision was limited to "determining whether constitutional rights were violated, whether errors of law were committed, or whether the necessary findings of fact are supported by substantial evidence." *Id.* at 398 n. 9 (internal citations omitted). We agree with Defendants that *Rooker–Feldman* deprives us of jurisdiction to review the Commonwealth Court's holding in *Ferguson* as it relates to an interpretation of the law of the Commonwealth of Pennsylvania.

However, despite the state appellate court's reference to "constitutional rights" as noted above, *Ferguson* was clearly not resolved on constitutional grounds. Therefore, to the extent that we are evaluating the constitutionality of the Defendants' ability to restrict unlicensed individuals from being involved in the sale of preneed services, we are not sitting as an appellate court reviewing the holding of *Ferguson*, since as noted this would be a violation of the *Rooker–Feldman* doctrine.[12] Rather, our review here is *de novo*.

On the merits, the *Ferguson* court determined that Morey's actions constituted the sale of funeral goods and services, which the court found under the Law to be only in the purview of licensed funeral directors. *Id.* at 400 ("[I]t would be unreasonable to presume that Morey did not engage in funeral directing when she handed over the price lists to the insureds."). In so holding, the court emphasized, again without reference to constitutionality, that merely offering a preneed contract or handing over a price list would

---

11. Morey signed the Estimated Worksheets as a "counselor," not as a funeral director or insurance agent. *Id.*

12. The *Ferguson* court discusses the constitutionality of the Board's actions only with the briefest of cursory comments because the focus of their inquiry was whether the adjudications violated the Law. For example, when discussing the vagueness of the Law, the court used the phrase "unconstitutionally vague" without any analysis of constitutional law. Similarly, the court mentions, without discussing, that Ferguson argued that "the distribution of price lists is constitutionally protected commercial speech." *Id.* at n. 15. Because the "Board [did] not dispute th[at] proposition," the Commonwealth Court did not analyze the issue. *Id.* Therefore, the mere mention of "constitutionality" does not comport with the court's focus, which was on whether the Board had exceeded the scope of its mandate under the Law.

constitute illegal funeral directing. Specifically, *Ferguson* held that the:

[L]aw is clear: it prohibits persons other than licensed funeral directors from (1) engaging in discussions with individuals regarding the selection of funeral services, (2) offering to enter into a contract for funeral goods and services when needed and (3), making financial arrangements for the sale of funeral services and merchandise incidental to those services.

*Id.* at 401. At bottom then, *Ferguson,* as well as the Board members' interpretation of the Law, have severely restricted and perhaps even barred non-licensed employees of funeral directors from even disseminating information with respect to preneed funerals funded by life insurance policies to consumers in Pennsylvania.

### 3. *The Plaintiffs' Claims*

Thus, at the start of this litigation in 2001, the Plaintiffs operated subject to the holding in *Ferguson* as well as the Resolution. When the Plaintiffs initiated this litigation, they argued that both the Resolution and the Adjudication as affirmed in *Ferguson* "directly and adversely infringed upon [their] First Amendment right to freedom of speech." (Pls.' Br. Supp. Pls.' Mot. Summ. J. at 7).

As noted above, on remand from the Third Circuit we denied Defendants' Motion to Dismiss and directed the parties to commence discovery. Thereafter and also as noted, on May 5, 2004, the very eve of Defendants' depositions in this case, the Board members repealed the Resolution. Notably however, in those subsequent depositions, several Defendants stated that they believed that the Resolution **remained a proper statement of the Law** in Pennsylvania. The following exchange is excerpted from the deposition of Defendant Janice Mannal:

Q: Even though you voted to rescind the [R]esolution, is it your position

that the [R]esolution and the language of the [R]esolution constitute a proper statement of the law of Pennsylvania as it exists today?

A: Yes.

(Pls.' Submission Pursuant to Order of Ct. at 6). Defendants Fluehr, Pinkerton, and Michael Morrison provided similar answers in their depositions. *Id.* at 9, 12, 15. At oral argument, counsel for the Defendants stated that she agreed with the Court when asked if *Ferguson* supplanted the Resolution. (Oral Arg. Tr. at 4–5). In any event, it is clear to us that despite the rescission of the non-binding Resolution by the Board, a number of the Board members, if not the entire Board, still believe the Resolution's central prohibitions continue unabated.

The Plaintiffs' complaint requests that we "enjoin the Defendants from taking any action that would limit their right to disseminate accurate information regarding funeral services and merchandise, including the cost thereof." (Cmplt. at 14). The Plaintiffs ask this Court to prohibit the Defendants from using their adjudicatory powers to sanction the conduct in which they wish to engage so that the unlicensed among them can, in effect, disseminate information and solicit preneed funeral customers on behalf of licensed funeral directors.

This pre-Resolution conduct involved the distribution by unlicensed employees of prices lists and engaging in discussions with potential preneed customers. According to an affidavit submitted by the Plaintiffs of Harry C. Neel, President of Plaintiff Jefferson Funeral Home, prior to the Board's enactment of the Resolution his "trained, competent and supervised non-licensed employees would answer consumer questions concerning all but technical issues of preneed funeral arrangements." (Neel Decl. ¶ 8; Pls.' R. at 362).

These non-licensed employees received "extensive training in customer relations and cemetery/funeral merchandise and services." *Id.* ¶ 7. Under the post-Resolution regime, Neel "has been compelled to restrict, for fear of prosecution [by the Board] disseminating information [including price lists] to consumers in an effort to comply with the stated position of . . . the Board." *Id.* ¶ 9.

Finally, it is important to reiterate at this juncture that the non-licensed Plaintiffs, Walker and Frey, are employees of a licensed funeral director. As a result, all of their activities are overseen and supervised by that same licensed funeral director. The funeral director has a strong incentive to train and monitor his employees, because his license is at risk if those employees stray from what is legal and proper, and his business may suffer if they are unprofessional. For example, in *Ferguson*, the Board initiated an adjudication against Ferguson in part for his dealings with Morey, with whom he contracted but did not employ. Therefore, to the extent that we examine the Board members' conduct vis-à-vis these Plaintiffs or others similarly situated, we are specifically not charged with the task of determining the legality of the conduct of unlicensed individuals, unconnected to licensed funeral directors, as that conduct relates to engaging in preneed funeral services discussions with consumers as well as disseminating information to them about funeral prices and services. Rather, our analysis relates to circumstances wherein the unlicensed individuals engaged in these discussions and disseminating information are employed and directly supervised by funeral directors.

### C. *The Growth of Preneed Funeral Plans Since the Enactment of the Law*

The funeral industry has a long and noble history of serving the public in times of grief and need. However, as with any profession, the industry has received its share of blemishes for allegedly taking advantage of consumers. There are two noteworthy books on the subject by the late author Jessica Mitford (*The American Way of Death* and *The American Way of Death Revisited*) both of which have as a central premise that death, for many Americans, is a taboo subject with which they are ill-prepared to deal. Ms. Mitford postulated that this can lead to unfortunate results when the time arrives for customers to purchase funeral and burial services.

For many years before the FTC's Funeral Rule was adopted in 1982, there were reported instances of funeral directors taking advantage of their customers. To illustrate, the FTC found, for example, that consumers were often "stymied by funeral homes' refusal to provide price information" and "consumers were told that the law required embalming when in fact it did not." Likewise, "a number of funeral providers have falsely informed consumers that state law required a casket for direct cremation services." Fred S. McChesney, *Consumer Ignorance & Consumer Protection Law: Empirical Evid. from the FTC Funeral Rule*, 7 J.L. & Pol. 1, 6–9 (*quoting* Funeral Rule Statement of Basis and Purpose and Regulatory Analysis, 47 Fed.Reg. 42,260 (1982)); *see also Penna. Funeral Dirs. Assoc. v. FTC*, 41 F.3d 81 (3d Cir.1994)(applying the Funeral Rule to Pennsylvania funeral directors who were improperly assessing casket handling charges when caskets were purchased from third parties). One result of the Funeral Rule is that all purchasers of funeral services are able to see an itemized price list for services. This has undoubtedly encouraged consumers to not only shop for better prices, but has also motivated them to consider purchasing services in advance in the form of preneed funerals.

In 1998, a report estimated that the funeral industry was a $25 billion business in the United States. Mirian Horn, "The Deathcare Business: The Goliaths of the Funeral Industry are Making Lots of Money Off Your Grief," U.S. News & World Rep. (Mar. 23, 1998). As our population ages and reaches the inevitable point of death, the size of the industry will no doubt grow accordingly. An increasing portion of the money earned in the industry is through the sale of preneed policies. Approximately thirty-two percent of Americans age fifty or older have prepaid some portion of their burial. AARP, *Older Americans and Preneed Funeral and Burial Arrangements:. Findings from a 1998 Telephone Survey and Comparison with a 1995 Survey,* (1999) ("AARP Preneed Survey").

Customers are attracted to preneed services for several reasons. First, is the evident peace of mind that comes with knowing that one will be properly cared for after death. Second, is the ability of customers to lock in the cost of their funerals at current prices, without a need to be concerned with inflation. Also, funds spent on a preneed insurance plan are not included in a calculation of Medicare eligibility. ·Correspondingly, the benefit for funeral directors is even more obvious— the ability to secure clients, market share, and cash long before they would need to provide services. *See* Ashley Hunt, Comment, *There is a New Trend of Corporate 'Death Care:' Let the Buyer Beware,* 27 Nova L.Rev. 449, 452–53 (2003).

Although Pennsylvania appears to have extensive and accurate laws governing the maintenance of preneed funds in trust accounts, *See* 63 Pa. Cons.St. § 480 (discussing "Future Internment"), the Commonwealth has given relatively little attention to the solicitation of potential preneed customers other than the Board members' somewhat *ad hoc* attempts to outlaw unlicensed individuals such as Plaintiffs. In our view, the conduct here in question by the Board members evinces their failure to properly fulfill their duty to the funeral industry and consumers. There is no evidence that the Defendants fully analyzed the relevant issues in order to test their assumptions about preneed solicitation by unlicensed individuals by conducting research, nor did they complete studies or take testimony in an effort to create a carefully crafted response to the exigencies of the growing preneed industry.[13]

It is against this factual and historical backdrop that we proceed to our discussion of the applicable law.

## DISCUSSION

We now turn to the constitutional challenge instituted by the Plaintiffs against the various Board members in their official capacities. To reiterate, the Plaintiffs argue that the Board members' interpretation of the Law constitutes an impermissible restraint on the Plaintiffs' commercial speech. The Defendants dispute this both in their opposing briefs as well as in their own Motion for Summary Judgment.

### A. Commercial Speech and The Central Hudson Test

The Supreme Court first held that commercial speech was protected by the First

---

**13.** We also note that the General Assembly of Pennsylvania has allowed the law governing preneed issues to stand largely unchanged since the 1950s, thus providing little help or guidance to the Board. While the ultimate result of this Memorandum and Order will not be to strike down any portion of the Law, we strongly urge the General Assembly to consider comprehensive changes to the Law, as they are clearly long overdue. Such changes would obviously be helpful to the Board, which admittedly has suffered as a result of attempting to utilize antiquated provisions of the Law to regulate practices, such as those in question here, which were not in existence· at the time the Law was enacted.

Amendment in *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Commercial speech is protected because:

> The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment.

*Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) (*quoting Edenfield v. Fane*, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)).

Here, even though we are analyzing a subject as sensitive as funerals, which implicate broad concepts such as death and religion, the speech the Plaintiffs desire to engage in is primarily commercial because their goal is to solicit customers. This does not mean that the interest of consumers in this speech is unimportant. As the Court noted in *Virginia Bd.*, "[a] particular consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id.* At the outset, we note that both parties agree that the speech at issue is commercial speech, entitled to some amount of First Amendment protection.

■ In *Cent. Hudson Gas & Elec. Corp. v. Pub., Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court developed a four-prong test for analyzing whether a particular government regulation on commercial speech violates the First Amendment.[14] To be a permissible regulation all four prongs of the *Central Hudson* test must be satisfied:

(1) Is the speech protected by the First Amendment?

(2) Is the asserted governmental interest that the regulation seeks to protect substantial?

(3) Does the regulation directly advance the governmental interest asserted?

(4) Is the regulation more extensive than necessary to serve that interest?

*Id.* at 566, 100 S.Ct. 2343.

For the *Central Hudson* test to be applicable, there must be government regulation restraining the commercial speech. In what we must again describe as a misguided attempt to derail this litigation, however, the Defendants have continually avoided formalizing, in a written and binding regulation, a statement as to the precise restrictions placed on unlicensed individuals and their ability to disseminate information with respect to preneed funeral services on behalf of licensed funeral directors. (*See* Oral Arg. Tr. at 10–12).[15] We do have, by virtue of the discovery

---

**14.** The First Amendment states, in relevant part that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I.

**15.** Despite her very professional attempts to argue Defendants' position at oral argument held on December 23, 2004, the Court had great difficulty getting an answer from Deputy Attorney General Yerger regarding what an unlicensed individual can do regarding disseminating information with respect to preneed policies, as illustrated by the following exchange:

The Court: So let me ask my question again, because I'm not sure it was answered, with all due respect. Can an insurance agent who is not licensed as a funeral director go out and do anything in this realm?

Ms. Yerger: Well, I don't think and I don't mean to be evasive and not answer the question, I don't think that that has been brought before the Board. I think they see it as cut and dry, what happened in *Ferguson*, which is disseminating information about the services.....

*Id.* Deputy Attorney General Yerger, beyond this exchange, was asked several times by the

conducted by the Plaintiffs, the Board members' individual interpretations of the Law and how they intend it to apply to unlicensed individuals.

The record before us shows that the Defendants wish to have the broadest possible interpretation of both the Law and the now-repealed, non-binding Resolution. In his deposition, Defendant Fluehr stated that both he (and the other Board members) believed the Resolution to be a proper statement of Pennsylvania law and that it "certainly advises the licensees that they should, they themselves, distribute the general price list to the consumer." (Pls.' Supp. Submission at 9). Fluehr explained that the Resolution was superfluous in light of the Commonwealth Court's holding in *Ferguson*, which is binding on the Board and all funeral directors.

Similarly, at oral argument, counsel for the Defendants, Deputy Attorney General Yerger, stated that unlicensed individuals cannot distribute price lists and "can't sit down with the consumer and they can't talk to them about individual services and what each of those services will cost." (Oral Arg. Tr. at 11). Yerger argued that this prohibition extends to counseling consumers who are considering whether to purchase preneed services. Neither counsel Yerger, Defendant Fluehr, nor any of the other Defendants have said what

speech, if any, by unlicensed individuals, is permissible.

Despite this confusion, the Board members have failed, despite an invitation to do so by this Court, to clarify their interpretation of the Law following *Ferguson*. Instead, it appears that they would rather the Plaintiffs, and others similarly situated, rely on the Commonwealth Court's holding on the limited facts of the two adjudications upheld in *Ferguson* as a statement of their position. Lacking any further clear guidance from the Board members, for the purpose of the case *sub judice*, we will take the statements both in depositions and through counsel at oral argument to be equivalent to a prohibition against unlicensed individuals distributing price lists or in any other way communicating with preneed funeral customers on the behalf of licensed funeral directors.[16] We will use this characterization in our analysis under the *Central Hudson* test, below.

### 1. *Is the Speech in Question Protected by the First Amendment?*

Our focus under this first prong is on whether the speech at issue "concerns unlawful activity or is misleading. If so, the speech is not protected by the First Amendment." *Thompson*, 535 U.S. at 367, 122 S.Ct. 1497. The Defendants contend

---

Court to clarify what conduct is and is not permitted today by the Board. She repeatedly declined to do so, falling back on the belief that because the Board has not had post-*Ferguson* adjudications on this matter, that there is no clear statement. However, beyond merely initiating adjudications, the Law tasks the Board with enacting binding regulations that interpret the Law so that funeral directors can have a better understanding of what is permitted. *See* 63 Pa.Stat. § 479.16(a) ("The [B]oard shall be ... empowered to formulate necessary rules and regulations not inconsistent wit this act for the proper conduct of the business or profession of funeral directing and as may be need-

ed necessary to properly safeguard the interests of the public and the standards of the profession."). We note that nowhere within the Law is the Board authorized to issue nonbinding resolutions as it enacted, and then rescinded, in this case.

**16.** We believe this prohibition to be so broad that even the most casual contact, such as answering a telephone call from an interested consumer, would be prohibited. While we doubt this is what the Board members intend, their statements lack the clarity necessary to determine what is permissible, and it now devolves to us to traipse into that area as a result of this litigation.

that the speech is unlawful and thus that our inquiry must cease here. They claim that so long as the speech complained about is "what [the] state court deemed as counseling or sales in *Ferguson*, then it becomes unlawful activity" and illegal speech not entitled to First Amendment protections. As such, they argue, this Court cannot disturb the Commonwealth Court's holding in *Ferguson*. (Defs.' Br. Supp. Pls.' Mot. Summ. J. at 15). This circular argument must fail first, because it would mean that government speech regulations can be protected from examination as to their constitutionality if a state court preemptively holds that the regulation does not violate a state law, and second, because it is inapposite to the Third Circuit's determination on its direct review of this action. Put another way, we are not estopped from evaluating the constitutionality of the Board members' actions simply because another court analyzed whether the Board violated state law under different facts.

Inasmuch as the Defendants' position appears to be simply that the constitutionality of the commercial speech at issue has previously been ruled on in *Ferguson*, we deem the speech lawful and hold that the first prong of the *Central Hudson* test is satisfied, and that the regulation or interpretation of the Law at issue are properly analyzed under *Central Hudson*. *See also Kleese v. Pa. State Bd. of Funeral Dirs.*, 738 A.2d 523 (Pa.Cmwlth.1999)(holding that funeral advertising is commercial speech and that regulations interpreting it subject to the *Central Hudson* test).

### 2. *Is the Asserted Governmental Interest that the Board Members Seek to Protect Substantial?*

Before addressing whether the government interest is substantial, we must isolate the asserted governmental interest. We will then proceed to a determination as to whether this interest is indeed substantial. *See Thompson*, 535 U.S. at 368, 122 S.Ct. 1497 (isolating an analyzing the asserted governmental interest).

In their brief, Defendants state that the governmental interest involved here "is to safeguard the interests of the general public and the consumer so that they know the prices of [ ] funeral services and [that] they are being advised and counseled by individuals selling funeral services as opposed to insurance sales people." (Defs.' Br. Supp. Mot. Summ. J. at 16). The Plaintiffs state that they "do not necessarily dispute that an interest of the Board should be to 'safeguard the interests of the general public.'" (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 16–17)(*quoting* Defs.' Br. Supp. Mot. Summ. J. at 16). We agree that the Board members should be able to safeguard consumers and we also agree with the Defendants that they have a substantial interest in assuring that "accurate price lists" are distributed to consumers.

As to the first part of the governmental interest asserted by Defendants, we find that there is a substantial governmental interest in (1) protecting the interests of the general public in its purchase of pre-need funeral services, and (2) ensuring that consumers receive only accurate price lists when purchasing or shopping for pre-need funeral services. *See N.C. Bd. of Mortuary Sci. v. Crown Mem'l Park*, 162 N.C.App. 316, 590 S.E.2d 467, 472 (2004)("[T]here is a rational relationship between consumer protection and limiting the pre-need sale of funeral merchandise to licensed funeral home directors for purposes of monitoring how funds for such products and services are handled.").

We next proceed to determine whether there is a substantial governmental interest in the second area asserted by Defendants; that is, whether unlicensed individuals should be barred from interacting with consumers in the manner described herein. We fail to see, on the

record before us, what substantial governmental interest exists relating to allowing only licensed funeral directors, rather than non-licensed insurance salespeople who are employed by, or agents of those funeral directors, to interact with customers and disseminate price and other information regarding preneed services. Here, as the unlicensed Plaintiffs are trained, supervised, employed, and directly controlled by a licensed funeral director, it appears that many of the Defendants' consumer concerns are overstated and thus misplaced. Furthermore, because the Law requires all preneed contracts to be signed by a funeral director, the funeral director must review his employees' work each time they submit a contract for his signature.[17] See 63 Pa. Cons.Stat. § 479.13(c).

There is no evidence that an unlicensed individual working as the employee or agent of a licensed funeral director will give inaccurate or inappropriate information to consumers. In fact and as noted, there is a strong disincentive for that to take place given the funeral director's clear exposure to sanctions by the Commonwealth. For example, the unlicensed Plaintiffs here were working, without any recorded complaints, as employees and agents of Heffner and Jefferson Memorial. So long as all of their work is reviewed by their employer and principal, who is a licensed funeral director, and customers are required to consult with that licensed director, the opportunity for misleading consumers is minimal at best. Additionally, the second part of the Board members' stated governmental interest clashes with the provision of the Law which allows for unlicensed individuals to make temporary funeral arrangements after a death, when

the possibility of misleading consumers is no doubt far higher. See 63 Pa Cons.Stat. 479.13(d) (allowing unlicensed individuals to make temporary funeral arrangements).

■ Finally, we note that the Board cannot totally ban speech if their only goal is to prevent misleading speech, because a government cannot totally ban speech if its goal is to prevent dissemination of false and/or misleading information. Shapero v. Ky. Bar Ass'n, 486 U.S. 466, 476, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988)(overturning as overbroad Kentucky law prohibiting attorneys from sending direct mail solicitation to potential clients for fear that attorneys would send misleading information); see also In re R.M. J., 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (holding that when a state wants to prohibit false or misleading commercial speech that it must do so with less extensive regulation that a total ban). Courts have reasoned that a total ban is impermissible in this situation because lesser penalties can be enacted to prevent harm while protecting speech. As noted, not only is there no evidence in the record before us that the unlicensed Plaintiffs have provided false or misleading information, but likewise the record is devoid of evidence supporting the proposition that consumers in Pennsylvania have experienced difficulties at the hands of unlicensed individuals employed by funeral directors who attempt to disseminate truthful information regarding preneed funerals and life insurance policies to fund them.

To reiterate, we find that there is a substantial governmental interest in protecting the general public as it relates to the dissemination of information regarding, and the purchasing of, preneed funer-

---

**17.** It is certainly possible that an unattached and unsupervised insurance salesperson who is not trained by a licensed funeral director, and not acting as a funeral director's agent or employee, could represent potential harm to consumers and thus trigger a significant governmental interest. However, we again clarify that this is not the factual circumstance before us.

als. However, we do not perceive that a similar interest exists in mandating that licensed funeral · directors only · interact with the public in these areas. Having now isolated a substantial government interest, we now move to the third prong of the *Central Hudson* test.

### 3. Does the Board Members' Interpretation of the Law Directly Advance the Governmental Interest Asserted?

▮▮▮▮ Under the third *Central Hudson* prong, we must isolate the governmental regulation, or in this case the interpretation of the Law at issue and determine whether it directly advances the asserted interest discussed in the second prong, above. 447 U.S. at 566, 100 S.Ct. 2343. As noted by the Plaintiffs, the Supreme Court

> requires that 'the speech restriction directly and materially advanc[es] the asserted governmental interest. This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that **the harms it recites are real** and that its restriction will in fact alleviate them to a material degree.'

*Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001)(*quoting Edenfield,* 507 U.S. at 770–71, 113 S.Ct. 1792)(other internal citations omitted)(emphasis added). To succeed on this prong, the Defendants must be able to demonstrate that the "harms it recites are real" rather than speculative or imaginary. *Id.*

Several courts have addressed whether administrative agencies regulating professions (with a similar governmental interest of protecting the public), like the Board, can have regulations or interpretations that totally ban certain commercial speech as the Board members seek to do here. As it pertains to preneed funeral services, however, only two appellate decisions have addressed this issue; namely, two opinions of the same panel of the Fourth Circuit Court of Appeals upholding preneed funeral statutes in Virginia and West Virginia on ·the same day in 1989. *See Guardian Plans,* 870 F.2d at 123 (upholding a Virginia funeral law); and *Nat'l Funeral Svcs., Inc. v. Rockefeller,* 870 F.2d 136 (4th Cir.1989)(upholding a West Virginia funeral law). Only the latter case, in the majority opinion, applies *Central Hudson* and is relevant to our inquiry.[18] *Nat'l Funeral Svcs.* was a declaratory judgment action in

---

**18.** Although Defendants cite to *Guardian Plans* in their brief, the majority opinion did not examine the Virginia statute under the commercial speech *Central Hudson* standard. Rather, that court utilized rational basis review. In *Guardian Plans,* the plaintiff, Guardian Plans, was a corporation employing as its agent an unlicensed individual who sold insurance-funded prearranged funeral plans to consumers. After the irrevocable sale to the consumer, Guardian Plans would contract with a funeral home to provide the funeral services. The Virginia Board of Funeral Directors investigated funeral homes contracting with Guardian Plans, who subsequently initiated an action for declarative relief. The Virginia statute, which expressly forbade funeral directors from employing " 'steerers' or 'solicitors' " was challenged not as a restraint

on speech, but as an economic regulation. *Id.* at 128 (*citing* Va.Code § 54–260.74(2)). As such, it was held to the rational basis review standard, not the higher standard applied under *Central Hudson* which. requires that a government regulation of commercial speech be narrowly tailored to a substantial governmental interest.

Only in the dissenting opinion is the *Central Hudson* test implicated to determine the legality of restrictions on preneed services relevant. Senior Circuit Judge Butzner filed a lengthy and vigorous dissent, arguing that because the members of the Virginia Board could not agree on what the law and that Board's regulations interpreting the law meant, it was accordingly unconstitutionally vague. He also disagreed with the majority

which the plaintiffs sought to invalidate West Virginia's comprehensive regulation of preneed funeral service sales. In particular, the state required all sellers of these services to be state certified and prohibited in-person and telephonic solicitation of prospective customers and nursing homes. *Nat'l Funeral Svcs.*, 870 F.2d at 137–38.

Under the third prong of *Central Hudson*, the *Nat'l Funeral Svcs.* court compared preneed solicitation to solicitation of personal injury clients by attorneys in holding that "in person solicitation is 'a practice rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence and outright fraud.'" *Id.* at 143 (*quoting Shapero v. Ky. Bar Assoc.*, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988); *see also Ohralik v. Ohio State Bar Assoc.*, 436 U.S. 447, 457, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)). The Supreme Court stated that the "unique nature of the product in this case, makes . . . attorney cases analogous. In both, an advocate trained in the art of persuasion is trying to convince an emotionally vulnerable layperson that he needs professional services." *Id.* at 143 n. 11.

To the extent that *Nat'l Funeral Svcs.* holds that there are dangers inherent with personal solicitation both with respect to attorneys and funeral directors, we agree with its conclusion. However, the Plaintiffs do not request that we totally eliminate the Board's ability to protect consumers as they also agree that some amount of regulation is appropriate. As we determined above, the government has two substantial interests: (1) protecting the interests of the general public in their purchase of preneed funeral plans; and, (2) the distribution of accurate price lists. A total ban prohibiting unlicensed individuals from soliciting or disseminating information with respect preneed services does not directly advance either of these governmental interests.

First, the Board has no evidence, and we cannot comprehend that any exists, in support of its implicit argument that only a licensed funeral director has the training and capability to distribute an accurate price list of funeral services. We believe that the Plaintiffs are truthful when they state that, before the Resolution, they always provided accurate price lists to consumers, particularly since providing inaccurate price lists could have subjected them to prosecution by either the Pennsylvania Attorney General or the FTC. Supervised unlicensed employees or agents of a funeral director are doing nothing more than distributing an itemized price list generated by their principal or employer, thus eliminating or at least minimizing the chance that it would be inaccurate based on the same exposure to prosecution.

As to the other governmental interest, which is the more generalized goal of protecting the interests of the general public when purchasing preneed funeral plans, we cannot find that the Board members' prohibitions at issue in this case serve that purpose. As previously noted, during discovery, each Defendant was asked if they:

> kn[e]w of any studies, reports, analyses, statistics, communications or other documents which concern or relate to consumer confidence and/or consumer injury with regard to unlicensed sale of

---

and stated that the application of the funeral law to "ban telemarketing of preneed funeral arrangements infringes the appellants' right to commercial speech." *Id.* at 133. Specifically Judge Butzner wrote that the "state has [a] substantial interest in the sale of preneed funeral arrangements" and "protecting consumers from fraud and coercion" but that restrictions on telemarketing did not directly advance either of these interests. He noted that the state has other mechanisms to outlaw fraud and prevent coercion, and this law did not further the state's goals.

preneed [funeral] insurance, plans and services? ... (Pls.' R. at 289, *et. seq.*). In answering this question, none of the Defendants put forth any evidence that consumers had been harmed by the unlicenced solicitation of preneed funeral services. For example, in his deposition, Defendant Gary Morrison stated, "I thought the consumer needed to be protected" but when asked if he had any data to support his "thought" he stated that he "did not recall." (R. at 56–57). Furthermore, as the unlicensed Plaintiffs Walker and Frey only desire to interact with customers, and cannot actually complete sales in any event, they will necessarily submit their work for review and finalization by a licensed funeral director, who, under the Law, is the only person who can enter into a contract with the customers.

Only Defendant Pinkerton was able to identify an actual instance in which a problem arose with respect to unlicenced individuals engaging in the prohibited conduct. He testified to an incident in Pittsburgh where an unlicensed individual selling preneed service misrepresented his relationship with a Pittsburgh funeral home. (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 13). However, there was no need for the Board to intervene, as this activity was addressed by the Pennsylvania Attorney General's Office as an unfair trade practice. *Id.*[19] Moreover, it is evident that this cited example is distinguishable from the case *sub judice*, as our assumption is that we are dealing with individuals who will not misrepresent their affiliations, and as previously noted there exist other more nuanced mechanisms to address misrepresentations. To the extent that unlicensed individuals engage in a course of misrep-

resentation, as with the referenced example, they are subject to criminal prosecution outside the authority of the Board in any event.

Not only is the rationale for the individual Board members' positions absent from the record, it can indeed be argued that their conduct may be having the opposite effect intended and thus that it is causing harm to consumers. Insurance companies frequently sell life insurance policies that approximate funeral and burial costs. For example, Philadelphia-based insurer Colonial Penn Life states in its advertisements that "The average cost of a funeral, as of July 2004, is $6,500, and this does not include cemetery costs." (Colonial Penn Guaranteed Life Insurance Description at http://www.colonialpenn.com/Web/ GuaranteedAcceptance/Description.aspx, last visited March 20, 2005). Since this is an average, if Colonial Penn then proceeds to sell $6,500 life insurance policies to its customers, many of them may have purchased too much insurance while others may find themselves underinsured. However, were an insurer able to provide the exact cost of a funeral from a funeral home that the customer is likely to use, the customer would be more likely to purchase a correct amount of insurance, rather than an estimate unsubstantiated by pricing information.

The Defendants' belief that unlicensed individuals' distribution of price lists can harm consumers is further undermined by the laws of at least thirty-four states and the District of Columbia, all of which allow unlicensed agents of funeral directors or third parties to sell preneed funeral plans (and therefore they are able to distribute price lists in aid of those sales).[20] Sandra

---

**19.** Pinkerton, in his deposition, also stated that he was aware of a consumer complaint involving the Catholic Funeral Plan, but this is not relevant because the complaint was withdrawn and he offered no further details. *Id.*

**20.** California, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

B. Eskin, *Preneed Funeral and Burial Agreements: A Summary of State Statutes*, AARP Public Policy Institute (1999) ("AARP State Survey"). Although many of these states require individuals to receive a permit to sell or solicit customers for preneed plans, this is significantly easier than obtaining a full-fledged funeral directing license. *See e.g.* Iowa Code § 523A *et seq* (requiring that a preneed seller must be a funeral establishment or employee thereof, with a permit). A search of case law in these states uncovered no examples of consumers being harmed from being solicited by unlicensed individuals.

Lacking any evidence in the record that having unlicensed individuals soliciting customers for preneed plans actually harms consumers, the Board members nonetheless desire that a blanket prohibition be imposed upon the speech of unlicensed individuals. This argument cannot survive *Central Hudson's* third prong because it does not directly advance the Board members' asserted governmental interest.

However, as we also address in our analysis of the fourth prong, we do believe that there is a significant governmental interest that the Board should be able to protect in this arena, but that it does not involve the conduct by the Plaintiffs in the case at bar. The previously cited AARP Preneed Study determined that the individuals solicited for preneed services are generally older than 65 years of age and have lower than average incomes ($15,000 to $40,000). *See* AARP Study at 3. Older and poorer people are more likely to be taken advantage of by unscrupulous insurance salespeople. Therefore, we believe that the Board does have an interest in regulating individuals who are **not** linked to a licensed funeral director and who attempt to actually disseminate information regarding prices. Likewise, the Board clearly has an interest in prohibiting the actual **sale** of a preneed funeral by an unlicensed individual absent the direct involvement of a licensed funeral director. Having determined what portion of the Board members' prohibitions directly advance the substantial governmental interested, we proceed to *Central Hudson's* final prong.

4. ***Is the Board Members' Current Interpretation of the Law More Extensive than Necessary to Serve the Governmental Interest Asserted?***

■ According to the Third Circuit:
The fourth step of the *Central Hudson* test does not require government to use the least restrictive means to achieve its goals, but it does demand a 'reasonable fit between the legislature's ends and the means chosen to accomplish those ends, ... a means narrowly tailored to achieve the desired objective.'
*Pitt News v. Pappert*, 379 F.3d 96 (3d Cir.2004)(*quoting Lorillard Tobacco*, 533 U.S. at 528, 121 S.Ct. 2404 (2001)(other internal citations omitted)). We must therefore look to see whether the means the Board members have chosen to accomplish their ends; namely, a blanket prohi-

Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Wyoming, Utah, Washington, West Virginia, and Wyoming all permit, either via enacted law or administrative regulation, third parties or agents of funeral directors to sell or solicit preneed funeral plans. AARP State Survey at 2–67.

Pennsylvania, Arizona, Maine, Maryland, Minnesota, Rhode Island, South Carolina, Virginia, and Vermont stand as the few states which allow licensed funeral directors only to sell or solicit preneed funeral plans. *Id.*

The laws of Arkansas, Idaho, Mississippi, and Montana are unclear, while Alaska has no law or regulation governing preneed funeral plans. *Id.*

bition on the dissemination of information and preneed solicitation, are necessary to protect consumers purchasing preneed funeral services. *Lorillard,* 533 U.S. at 556, 121 S.Ct. 2404 ("We have made it clear that the 'least restrictive means' is not the standard; instead the case law requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends ... a means narrowly tailored to achieve the desired objective.")(internal citations omitted). Thus we ask whether the Board members' interpretation of the Law and the resulting prohibitions are narrowly tailored to fit the previously stated substantial governmental interest.

Again, we turn to the Fourth Circuit's analysis in *Nat'l Funeral Svcs.* for guidance, as there are no cases within the Third Circuit on or close to this point. There, the court held that "the [West Virginia] statute does not totally insulate the private residence from [commercial] speech" in upholding bans on in person and telephonic solicitation while permitting mail solicitation. 870 F.2d at 145; *but see Gregory v. La. Bd. Of Chiropractic Exam'rs,* 608 So.2d 987, 992–93 (La.1992)(Agreeing that "abuse and mistakes can be prevented by less restrictive means than a blanket ban on direct mail solicitations" by licensed chiropractors, who like funeral directors have their profession regulated by a state agency). In both *Gregory* and *Nat'l Funeral Svcs.,* the courts focused on the availability of "alternatives left open by the statute." *Nat'l Funeral Svcs.,* 870 F.2d at 145. Here, the

Defendants deign to prohibit **all** solicitation or contact by unlicensed individuals, leaving no other alternative for unlicensed employees and agents of funeral directors to engage in commercial speech in this area. *Gregory,* 608 So.2d at 993. (*citing In re R.M.J.,* 455 U.S. at 191, 102 S.Ct. 929 (holding that the state may only impose restrictions reasonably necessary to prevent deception.)). Therefore, the Board members' interpretation of the Law and the resulting prohibitions are more extensive than necessary and are not narrowly tailored to meet the asserted interest.

The Plaintiffs note that the Resolution and the Board members' interpretation of the Law would likely prohibit an unlicensed individual from selling a casket; however, this is a clearly legal activity as it is done daily in Pennsylvania.[21] While it is evident that the Board members likely did not intend for their statements to be construed as such, it is quite possible that by prohibiting the "distribution or summarization of any price list of merchandise available from any specific funeral home" the Defendants' statements could likely also be construed as prohibiting the direct sales of caskets by unlicensed individuals or entities. Again, there is no evidence that they intend to extend their prohibitions to this area, but this lack of clarity as well as the potential sweeping effect of the Board members' statements clearly create unconstitutional restrictions on the Plaintiffs' right of free speech. As a result of the Defendants' considered failure to enact a

---

**21.** For example, the discount retailer Costco sells caskets via its website to Pennsylvania residents for prices ranging from $924.99 for the steel "The Lady of the Guadeloupe" model to $3,999.99 for the bronze "Charles Casket" model. *See* "Costo.com," at http://www.costco.com/Common/Search.aspx?whse= & topnav= & search=caskets, last visited March 22, 2005. Caskets can be delivered directly to a funeral home, free of charge. *But see Powers v. Har-*

*ris,* 379 F.3d 1208 (10th Cir.2004), *cert. denied*— U.S. ——, 125 S.Ct. 1638, —— L.Ed.2d ——, 73 USLW 3338 (2005) (No. 04–716)(upholding a Fourteenth Amendment privileges and immunities and substantive due process challenge to an Oklahoma law that requires both a funeral directors license and a funeral establishment license before a person may lawfully sell time of need caskets while allowing unlicensed individuals to sell preneed caskets).

clarification of their interpretation of the Law post-*Ferguson* and after rescinding the Resolution, both consumers and the funeral industry Pennsylvania have been forced to speculate as to precisely what conduct by unlicensed individuals is permissible, thus creating an untenable situation which regrettably necessitates judicial intervention.

## B. *Declaratory Relief*

■ To reiterate, thus far we have determined that Plaintiffs have brought a facial challenge under the First Amendment to the actions of the Board members who have sought to restrict unlicenced individuals from interacting with consumers interested in preneed funeral services. Next, we proceeded to apply the *Central Hudson* commercial speech test and determined that the Board members' restrictions on the activities of unlicenced individuals constituted an impermissible restriction on their First Amendment free speech rights. As previously discussed, the Board members' withdrawal of the Resolution, and the absence of any subsequent clarification by them, can only be interpreted by us as a blanket prohibition. This blanket prohibition violates the *Central Hudson* commercial speech test because the Board members' interpretation of the Law is not narrowly tailored to address the substantial governmental interest asserted by them.

### 1. *The Availability of Declaratory Relief*

■ Plaintiffs, in their complaint, request that we grant them declarative relief. Pursuant to Federal Rule of Civil Procedure 57 and the Declaratory Judgment Act of 1934 (the "Act"), this Court:

may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and ef-

fect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. The Act "does not attempt to change the essential requisites for the exercise of judicial power. By its terms, it applies to 'cases of actual controversy,' a phrase which must be taken to connote a controversy of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325, 56 S.Ct. 466, 80 L.Ed. 688 (1936)(upholding the Act's constitutionality). In the First Amendment context, we are to give both Rule 57 and the Act liberal construction. *Exxon Corp. v. Fed. Trade Comm'n*, 588 F.2d 895, 900 (3d Cir. 1978).

### 2. *Appropriate Relief Under Central Hudson*

■ It is well-established that it is not within the purview of the federal courts to either regulate or legislate. Those tasks are assigned to the Board and the state legislature, respectively. Rather, at this stage, we must endeavor to define for the Defendants, the Plaintiffs, and those similarly situated what conduct is constitutional, so that the institutions charged with the responsibility to regulate the funeral industry may do so. Accordingly, our holding can only be a broad exercise in setting parameters, and it will devolve to the Board and the General Assembly of Pennsylvania to provide clarity and definition to the funeral industry and the public.

■ Pursuant to *Central Hudson*, we hold that an individual who is a licensed insurance agent but not a licensed funeral director, and who also is an employee or agent of a particular funeral director may interact with consumers, disseminate accurate price information, and solicit those individuals for the purpose of having their employer sell preneed funeral services and

plans on behalf of a licensed funeral director.[22] Under no circumstances can unlicensed individuals contract with consumers for the sale of preneed funerals, nor can they act as a "funeral director" as defined in § 479.2(1) of the Law. Within these interactions it is not our purpose to engage in an analysis of what precise speech by unlicensed individuals is prohibited or allowed under the Law. Rather, our holding is intended to permit unlicensed individuals to discuss preneed plans with consumers so long as these communications occur under the auspices, employment, direction, and control of a licensed funeral director. In light of the substantial and appropriate governmental interest asserted, we are not restricting the Defendants from requiring close supervision of the said unlicensed employees. Moreover, the governmental interest asserted would support, in our view, an appropriate regulation which requires licensed funeral directors employing unlicensed individuals in this capacity to consult face-to-face with all preneed customers before the customers' proposed contracts are signed by the funeral director.

A regulatory scheme established around these parameters would ensure that the identified substantial government interest would not be ignored. To reiterate, those interests are: (1) protecting the interests of the general public in their purchase of preneed funeral plans; and, (2) the distribution of accurate price lists. These interests will remain protected not only because of the direct supervision of the unlicensed individuals by licensed funeral directors, but also because the Board is free to adopt regulations which will further define what conduct is permissible within the interac-

---

**22.** As stated in our prior Order, we determined that an actual case or controversy is properly before us. Before fashioning declaratory relief, we must be sure that any relief we may grant Plaintiffs would not result in an advisory opinion. *See United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). In *Mitchell,* Justice Reed stated that a general objection would result in an advisory opinion while "concrete legal issues" are properly justiciable. *Id.* at 89, 67 S.Ct. 556 (*citing Case of Hayburn,* 2 U.S. 408, 2 Dall. 409, 1 L.Ed. 436 (1792)). The Third Circuit has held that if a court desires to issue declaratory relief, that the judgment must have adversity of interests of the parties, conclusiveness of judicial judgment, and practical help or utility of that judgment. *Step–Saver Data Sys. Inc. v. Wyse Tech,* 912 F.2d 643, 647–50 (3d Cir.1990). These requirements are more liberally applied when they involve First Amendment free speech rights. *See Salvation Army v. N.J. Dep't of Community Affairs,* 919 F.2d 183, 192–93 (3d Cir.1990)(holding that a plaintiff could not challenge an ordinance when a state agency had expressly told the plaintiff that the state would not enforce the ordinance against it).

First, we look to see whether there is an actual dispute between the litigants. *Flast v.*

*Cohen,* 392 U.S. 83, 96–97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)(holding that taxpayers have standing to challenge spending on textbooks on the grounds that the spending is prohibited by the Establishment Clause of the First Amendment). Insofar as the parties in this action dispute what conduct unlicensed individuals may engage in, there exists an actual dispute between the litigants.

Next, we ask whether there is a substantial likelihood that a federal court decision in favor of the plaintiffs would bring about change or have some effect. *C. & S. Air Lines v. Waterman Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948)(holding that the Supreme Court could not review decisions awarding international air route rights because the president could disregard or modify a court's ruling). If we limit the right of Board members to restrict unlicensed individuals from distributing price lists, for example, the Board members are bound by our determination. The Board is required to act within the bounds of the U.S. Constitution as we determine that it applies to its conduct. Therefore, we do not find that this Order can be construed as an advisory opinion under *Mitchell.*

tions between unlicensed individuals and consumers.

Funeral directors unquestionably have a direct incentive to properly train their employees. As noted above, it is relatively difficult to become a licensed funeral director in Pennsylvania and no doubt even more difficult to build one's funeral business. Therefore, when a funeral director's business and license are both on the line, funeral directors will undoubtedly act to ensure their unlicensed employees' compliance with the Law and all regulations promulgated by the Board. Were a funeral director to allow his unlicensed employees or agents to proceed in an unmonitored and untrained fashion, he or she could face significant financial penalties and even the loss of his or her license in the event employees violated Board regulations or the Law. *See Ferguson,* 768 A.2d at 393 (holding that the Board can punish funeral directors who associate with individuals who violate the Law).

Next, it is clear to us that unlicensed employees and agents of licensed funeral directors will distribute accurate price lists. They will receive their price lists directly from their employer and principal, the funeral director who, under the FTC rules previously discussed, must distribute accurate price lists to consumers. Having unlicensed employees doing the same only furthers the FTC's goal of ensuring that all consumers have accurate price lists when purchasing funeral services. We cannot see how consumers would be harmed by limiting who can distribute accurate price lists and other information to them under these circumstances. To the contrary, allowing unlicensed employees and agents to distribute this information will result in more people accessing this material, which will aid them in their preneed funeral planning.

Furthermore, allowing unlicenced employees to interact in this fashion with consumers on behalf of licensed funeral directors removes a conflict in the Board members' interpretation of the Law. As previously noted, the Law allows unlicensed individuals to make temporary funeral arrangements **after** a death in the absence of the licensed funeral director. By interpreting the Law as forbidding these same unlicensed individuals from interacting with consumers **prior** to a death, the Board members have created a clear contradiction. At oral argument and in her submissions, counsel for the Defendant stressed the unique ability of a licensed funeral director to counsel customers both at the time of a death and in a preneed situation. *See Kleese* 738 A.2d at 526 ("Generally, the time in which the consumer seeks the services of a funeral establishment is a very emotional and vulnerable time as a loved one has most likely just passed away leaving the consumer vulnerable . . ."). We do not disagree with this assertion, however it is clear that an unlicensed but properly trained and supervised employee or agent of a licensed funeral director will be able to discern what questions by a customer are best addressed to the funeral director (e.g., an explanation of embalming and its effects on the body) and what the preneed salesperson can address (e.g., the individual prices for various services). Our holding today will in no way take away from the important task licensed funeral directors have in counseling aggrieved individuals in their time of need. It is in the best interests of a funeral director, desirous of maintaining his license, to ensure that his employees do not offer information beyond their training and that they remain truthful and respectful in every way when dealing with customers.

## CONCLUSION

The Defendants, by their interpretation of the Law and by failing during the more

than three years that this action has been pending to formally issue clarifying regulations, have in our view unconstitutionally hampered the ability of the Plaintiffs and other similarly situated to lawfully conduct their businesses. The Defendants have also failed to identify to this Court a realized harm that consumers could face by being contacted by unlicensed employees or agents of licensed funeral directors with accurate price lists and other information about preneed funeral plans. As such, Defendants have violated the First Amendment rights of Plaintiffs and those who are similarly situated. We hope that our holding today will encourage the Board members to enact clear regulations consistent with our mandate, rather than non-binding resolutions, that will provide those in the funeral and insurance industries with substantial guidance regarding the sale of preneed funeral services.

Indeed, we have tailored this Memorandum and Order as narrowly as possible based on the parameters of the dispute before us, but in doing so we believe that the Board members have been given ample room within which to work. In closing, we strongly urge the Board members to fulfill their mandate by giving prompt attention to the goal of resolving all of the unclarity which has attended the sale and marketing of preneed funerals and life insurance polices to fund them in Pennsylvania. By doing so, the Board members will provide themselves with an accurate means to adjudicate alleged transgressions in this area, and in the end, the funeral industry and consumers in Pennsylvania will thereby achieve measurable benefits.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Rec.Doc.34) is DENIED.
2. Plaintiffs' Motion for Summary Judgment (Rec.Doc.30) is GRANTED to the extent that the individually named Defendants, in their official capacities as members of the Pennsylvania Board of Funeral Directors, shall not prohibit agents or employees of specific licensed funeral directors from providing accurate information to consumers regarding the sale of preneed funeral plans and services. This interaction shall include, but shall not necessarily be limited to, the distribution of accurate price lists to consumers, but under no circumstances may unlicensed individuals contract with consumers for the sale of preneed funerals, nor may they act as a "funeral director" as defined in 63 Pa. Stat. § 479.2(1).
3. The Clerk is directed to close the file on this case.